AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| CONTEC CORPORATION, | ) | |
| | ) | |
| Claimant, | ) | No. 50 T 133 00325 03 |
| | ) | |
| v. | ) | David W. Plant, Arbitrator |
| | ) | |
| REMOTE SOLUTION CO., LTD., | ) | |
| | ) | |
| Respondent. | ) | |

## AWARD RE CLAIMANT'S STANDING

I.    **INTRODUCTION**

A.    The Issue And The Parties

This Award is directed to the issue of whether or not claimant, Contec Corporation, has standing to enforce, and proceed under the arbitration clause in, a February 16, 1999 Manufacturing and Purchase Agreement ("1999 Agreement") between Contec L.P. and Hango Electronics Co., Ltd. ("Hango").

Contec L.P. was a New York limited partnership.  On August 18, 1999, Contec L.P. was "converted" to a New York limited liability company, under the name, Contec LLC.  On January 1, 2001, Contec LLC merged into Contec Corporation, a Delaware corporation.  Contec Corporation, the surviving entity, is claimant here.

Subsequent to February 16, 1999, Hango changed its name to Remote Solution Co., Ltd. The issue before the arbitrator stems from changes concerning the Contec entities, not any change in Hango's name.

B.    The Arbitration Clause

Section 19 of the 1999 Agreement provides, inter alia –

"In the event of any controversy arising with respect to this Agreement, ... such controversy shall be determined by arbitration held in the City of Albany, New York in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the 'AAA') ... .  The arbitrators shall have full authority, including authority to grant specific performance, injunctive or other equitable

relief provided that this Section 21 [sic] shall in no way affect the right of any party to seek interim equitable relief to maintain the status quo in aid of the arbitration in any court of competent jurisdiction."

The only dispute currently before the arbitrator is whether or not Contec Corporation has standing to enforce the 1999 Agreement and to proceed under its arbitration clause. Remote contends that Contec Corporation has no such standing. Contec Corporation argues that it does.

II.    BACKGROUND

On July 11, 2003, Contec Corporation filed a demand for arbitration against Remote.

According to the demand, Contec Corporation had been a defendant in an action for patent infringement pending in the United States District Court for the District of Delaware, which was settled in May 2002 (the UEI action). Also, Contec Corporation and Remote had been defendants in another patent infringement action pending in the same court (the Philips action). Contec Corporation settled with Philips in March 2003. Apparently, the Philips action has continued with Remote among the defendants. On May 23, 2003, it appears that Remote, through its U.S. subsidiary, moved in the Philips action for leave to assert a cross-claim against Contec Corporation for indemnification or contribution. Contec Corporation opposed the motion.

In its demand for arbitration, Contec Corporation alleges Remote has not satisfied its indemnity obligations to Contec Corporation under the 1999 Agreement, with respect to fees and expenses incurred by Contec Corporation in defending itself in the UEI action "and in settling the matter." In addition, Contec Corporation has requested that Remote satisfy its indemnity obligation with respect to the Philips action. Contec Corporation avers that, on August 2, 2002, Remote declined "to defend Contec, stating that '[a] share of fees and damage of Patents are a heavy burden for us so we can not bear these expense.'" Contec Corporation avers Remote has refused to pay to Contec Corporation "any of the fees and expenses incurred by Contec in defending itself in the [Philips action] and in settling that matter."

Contec Corporation alleges that, on June 20, 2003, Remote's Korean counsel transmitted to Contec Corporation copy of a complaint against Contec Corporation filed in a Korean court and seeking payment for units shipped to Contec in January 2003. Contec Corporation avers that that payment has been withheld as a set-off against amounts owed to Contec Corporation under Remote's indemnity obligations. Also, Contec Corporation avers Remote's claim for payment is governed by the Section 19 arbitration provision.

Contec Corporation seeks inter alia an award –

Of its "defense costs ... including attorneys' fees, damages, settlement costs, royalties and interest thereon" with respect to the UEI action and the Philps action.

Page -2-

Directing Remote to dismiss its Korean action.

Enjoining Remote from bringing any other action relating to any dispute arising out of the 1999 Agreement.

Directing Remote "to command" its U.S. subsidiary "to halt" its cross-claim against Contec Corporation in the Philips action.

Of damages "sufficient to compensate it for enforcing" the 1999 Agreement, including damages and expenses, including attorneys' fees, incurred in connection with this arbitration, Remote's Korean action, and Remote's cross-claim.

Contec Corporation estimates preliminarily the total relief requested to be between $1 and $1.5 million.

On about July 21, 2003, Contec Corporation filed a complaint in the United States District Court for the Northern District of New York (Northern District action) seeking an order that, inter alia, Remote arbitrate and dismiss or stay its Korean action, and enjoining Remote from bringing any other action or proceeding relating to any dispute arising out of the 1999 Agreement.

In his July 28, 2003 declaration, submitted in the Northern District action, Remote's director, Suk-Kyu Park, stated at paragraph 3, inter alia:

> "Remote Solution and Contec Corporation ('Contec') entered into a Manufacturing and Purchase Agreement, dated February 16, 1999."

On September 26, 2003 the Court in the Northern District action dismissed the complaint for lack of subject matter jurisdiction. On October 1, 2003, Contec Corporation filed an amended complaint in the Northern District action. The amended complaint seeks essentially the same relief as the original complaint.

On October 12, 2003, after considering submissions from the parties, this arbitrator ruled he had authority to determine whether or not Contec Corporation is entitled to enforce the 1999 Agreement and to proceed with this arbitration.

## III.    THE PARTIES' CONTENTIONS ON REMOTE'S CURRENT APPLICATION

### A.    Remote's Opening Memorandum

On October 17, 2003, Remote served and filed its opening memorandum on the issue of whether Contec Corporation may enforce the 1999 Agreement. This and Remote's other submissions are all "under protest with full reservation of rights."

Remote contends that no Contec entity gave notice of, and Remote never provided written consent to, the assignment of the 1999 Agreement to Contec LLC or Contec Corporation (Remote Open Mem 2-3). Remote argues these failures contravene the Section 21 prohibition against assignment of the 1999 Agreement, "by operation of law or otherwise, without the prior written consent" of Remote (Remote Open Mem 1-2).

Remote contends that Contec Corporation, as a non-party to the 1999 Agreement and its arbitration clause, bears the burden of proving Contec Corporation is entitled to assert rights under the 1999 Agreement (Remote Open Mem 3-4). Remote points to –

> Section 20 of the 1999 Agreement, providing that "This Agreement is not intended to benefit any third person other than Purchaser and Seller." Contec L.P. is the "Purchaser".

> Section 21, providing that "This Agreement ... may not be assigned ... whether by operation of law or otherwise, without the prior written consent of the other party ...".

> Section 13(b), providing that "IN NO EVENT SHALL EITHER PARTY HEREUNDER BE LIABLE TO THE OTHER OR TO ANY PERSON OR ENTITY NOT A PARTY TO THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES ... ."

> Section 23, providing that a waiver must be in writing and signed.

> Section 24, providing a modification must be in writing and signed (Remote Open Mem 2, 4)

Remote notes also that the arbitration clause, Section 19, refers only to the "parties", viz. inter alia, Contec, L.P. (Remote Open Mem 5). Thus, Remote argues, the arbitration clause grants rights only to the "parties".

Remote asserts that the general indemnity provision, Section 13(a), cannot avail Contec Corporation, because (1) Section 13(b) eliminates a non-party's rights for damages (i.e. indirect damages according to Remote), (2) the indemnification sought in this arbitration arises under Section 3(c), which extends only to Contec, L.P., and (3) Contec Corporation does not fall within any of the Section 13(a) categories entitled to indemnification (Remote Open Mem 5-8).

Remote contends the express prohibition of assignment by operation of law bars transfer of the 1999 Agreement by merger (Remote Open Mem 8-12), citing authority from various courts and purportedly distinguishing authority previously relied on by Contec Corporation. At bottom, Remote contends that the 1999 Agreement precludes transfer of contract rights

Page -4-

"without giving the other party a fair opportunity to evaluate the risks involved and to make an informed decision. Neither Contec Corporation nor any of its predecessors did that, and so must accept the fact that any rights and remedies they may have must find their origin outside the Agreement" (Remote Open Mem 12).

Remote asserts it has not given written consent to assignment (Remote Open Mem 13-14). Remote contends emails exchanged by (1) Remote or Hango Electronics, Inc. (a California corporation) and (2) Contec Corporation or Contec LLC fail to show that Remote agreed to any assignment of the 1999 Agreement (Remote Open Mem 13). Inter alia, Remote says these communications do not refer to an assignment, are not signed by Remote, and acceptance by Remote has not been shown. For example, Remote points to purchase orders which require signature and acknowledgment to avoid cancellation (Remote Open Mem 14). Remote contends "all of Contec Corporation's dealing with [Remote] are governed by common-law and UCC rights, and nor [sic] by the Agreement" (Remote Open Mem 14).

Remote elaborates on its no waiver contentions at pages 15 and 16 of its Opening Memorandum. Remote asserts that if the merger clause, Section 24, were the only relevant provision of the 1999 Agreement, "Contec Corporation might have an argument" (Remote Open Mem 15). However, says Remote, the non-waiver clause, Section 23, "protects against claims of waiver of rights by a course of conduct," citing New York authority (Id.). Also, Remote contends there is no evidence of knowing, intentional waiver by Remote, also citing New York authority (Remote Open Mem 16).

Remote contends Contec Corporation is barred by equitable estoppel from claiming waiver (Remote Open Mem 17-18). Remote argues Contec Corporation must, but cannot, show (1) Remote had a duty to speak and failed to do so with an intent to deceive, (2) Remote had knowledge of the facts, and (3) Contec Corporation reasonably relied – citing authority (Id.).

Remote concludes that the fact the 1999 Agreement now protects Remote from Contec Corporation's claims is not unfair, but is "the result of the contractual scheme that Contec L.P., the drafter of the Agreement, contemplated" (Remote Open Mem 18).

B.    Contec Corporation's Response

On October 24, 2003, Contec Corporation served and filed its response to Remote's opening memorandum, together with appended documents. The response included Contec Corporation's arguments as to why Remote ought to stay or withdraw its pending Korean action against Contec Corporation.

Contec Corporation contends New York law does not permit Remote to (1) reap the rewards of almost three years of accepting and filling orders for more than $6 million from Contec Corporation under the 1999 Agreement, and (2) now claim the 1999 Agreement is unenforceable

(Contec Response 1). Contec Corporation asserts the facts establish (1) Remote "did in fact agree in writing that the Contec-Remote Solution Agreement would apply to its business dealings with Contec LLC and Contec Corporation," (2) Remote elected to continue operating under the 1999 Agreement, instead of electing to terminate, (3) Remote is equitably estopped from objecting to the assignment to Contec Corporation, and (4) New York law is clear that "a mere change in corporate form with no substantial change in ownership... does not give rise to the type of assignment that would breach a contractual non-assignment provision" (Contec Response 1-2). Thus, Contec Corporation concludes "Contec L.P.'s rights and obligations under the Agreement passed to Contec Corporation, its successor-in-interest, which in turn has every right to enforce the agreement against Remote Solution" (Contec Response 2).

Contec Corporation contends "the undisputed facts" include (Contec Response 2-4) –

1.    Remote's invoices changed over time to reflect "Contec's then current corporate name", thus Remote "plainly knew that Contec's corporate form had changed."[1]

2.    Remote signed a "Purchase Quotation" with Contec LLC, pursuant to which Remote was to manufacture a model RT-U49C remote control, one of the models involved in Contec's indemnification claim. That purchase quotation stated that it "shall be covered by all terms and conditions defined in the Manufacturing and Purchase Agreement dated February 19 [sic], 1999 between Contec and Hango." Also, a letter from Contec LLC stated "Contec LLC is placing the attached purchase order with you for the development of the mold and software for the RT-U49C remote control. This order is governed by the terms and conditions as defined in our Manufacturing and Purchase Agreement of February 16, 1999."

3.    Remote received numerous emails from Contec Corporation authorizing Remote to proceed with the development of new products in accordance with Development Guidelines attached to the emails. The Development Guidelines stated "All development is governed by the Manufacturing Agreement between Contec and Hango." Remote allegedly responded "when it knew Contec was a corporation, in writing (specifically, by return email), and proceeded in accordance with the emails to develop the requested products." Contec Corporation cites a January 31, 2001

---

[1]    Contec Corporation asserts invoices from Remote's U.S. subsidiary also reflected such changes. Contec asserts Remote advised that the president of the subsidiary, Hango Electronics, Inc., is Remote's "official representative and executive" in the U.S., and "he is entitled to sign any kinds of documents and/or agreement including the Manufacturing Agreement ... on behalf of Hango Electronics Co., Ltd. in Korea" (Contec Response 2, n 1)

purchase order from "Contec Corporation" and March 21, 2001 invoice from Remote to "Contec Corporation."

4.    Remote accepted and filled Contec Corporation purchase orders that state "This purchase order is governed by manufacturing agreement with Contec."

5.    Remote accepted and filled more than $6 million in orders from Contec Corporation.

Contec Corporation asserts Remote's challenge to Contec Corporation's standing under the 1999 Agreement is a recent confection, and Remote never asserted this theory during the three years Remote did business with Contec Corporation (Contec Response 4). Also, in "the Delaware lawsuit" against Contec Corporation, Remote's U.S. subsidiary has averred in a cross-claim against Contec Corporation (in paragraph 6) that Remote built devices in issue there "pursuant to a contract between [Remote] and Contec" (Contec Response 4-5).

Contec Corporation contends that, if the Arbitrator finds that Contec Corporation is entitled to enforce the 1999 Agreement, "the Arbitrator must order Remote Solution to dismiss or stay its pending Korean action against Contec" (Contec Response 5).

Contec Corporation asserts that a formalistic "written consent" is not required (Contec Response 6). Contec Corporation contends Remote signed a purchase quotation agreement with Contec LLC which stated that that agreement "shall be covered by all terms and conditions defined in the Manufacturing and Purchase Agreement dated February 19 [sic], 1999 between Contec and Hango" (Id.). This, says Contec Corporation, evidences Remote's consent to the assignment (Id.) Contec Corporation contends Remote "on numerous occasions" developed new products in accordance with Development Guidelines attached to emails; the Guidelines stated "All development is governed by the Manufacturing Agreement between Contec and Hango" (Contec Response 7). Contec Corporation iterates that Remote replied "at times when Remote Solution knew that Contec was a corporation," as evidenced by a purchase order from Contec Corporation and an invoice to Contec Corporation (Id.).

Contec Corporation points to "numerous Purchase Orders" from Contec Corporation to Remote, stating "This purchase order is governed by manufacturing agreement with Contec" (Id.). Contec Corporation asserts Remote responded with invoices signed by Remote's president (Id.). Contec Corporation contends these invoices evidence Remote's consent to the assignment (Contec Response 7-8).

Contec Corporation argues the lack of a Remote signature on the Development Guidelines is irrelevant (Contec Response 8). Contec Corporation contends Remote knew that Contec Corporation was a corporation, and the Development Guidelines evidence Remote's consent to applying the 1999 Agreement to Remote's business dealings with Contec Corporation (Id.). As

Page -7-

for the purchase orders, Contec Corporation argues Remote's written consent is found in Remote's signed invoices which identified purchase orders without varying their terms (Contec Response 8-9). Thus, together, the purchase orders and invoices evidence Remote's consent (Remote Response 9).

Contec Corporation contends that if, as Remote asserts, common law and UCC rights control, the 1999 Agreement would be enforceable by Contec Corporation against Remote, because Remote accepted and filled Contec Corporation purchase orders that "incorporated the Agreement by reference" (Id.). Contec Corporation cites New York authority to the effect that filling an order results in acceptance of its terms and conditions (Id.).

Contec Corporation contends that, if Remote had not already agreed in writing to the assignment, Remote would have no reasonable basis for withholding consent (Contec Response 10). Contec Corporation asserts that Remote with full knowledge elected to continue operating with Contec Corporation under the 1999 Agreement, citing New York law relating to election of remedies (Contec Response 10-12). Contec Corporation contends that Remote elected to continue under the 1999 Agreement, even after being informed by Contec LLC and Contec Corporation of Remote's indemnification obligations under the 1999 Agreement (Contec Response 11).

Contec Corporation argues the Remote's no-waiver contentions do not avail Remote, because Remote's election to continue trumps any no-waiver provision, citing New York authority (Contec Response 12-13).

Contec Corporation elaborates on its equitable estoppel contention at pages 13-14 of its Response. Contec Corporation summarizes the history of the parties' dealings and notes that Remote never questioned Contec Corporation's right to enforce the agreement. Contec Corporation contends that Remote's actions do not constitute mere silence (Contec Response 14). Contec Corporation asserts it continued to rely on the 1999 Agreement, and under the circumstances, it would be unjust to permit Remote to escape its obligations under the 1999 Agreement (Id). Contec Corporation contends that the change to "Contec Corporation" on Remote's "invoices" evidences Remote's knowledge that Contec Corporation was successor-in-interest to Contec LLC.

Contec Corporation contends that Contec L.P.'s changes in "corporate form" did not result in an assignment that breached the 1999 Agreement, citing authority from New York and elsewhere (Contec Response 15-17). Contec Corporation argues that no interest of Remote was affected by the changes, and the changes had no effect on the business relationship between each of the Contec entities and Remote (Contec Response 15-16). Contec Corporation states that at the time of each change, the same person owned each Contec entity, and "it was essentially the identical business, both in terms of its relationship with Remote Solution and its ownership, in each of its forms" (Contec Response 16). Contec Corporation argues the authority it cites (that change of corporate form may not violate a non-assignment clause) apply to assignments by

operation of law (Id.). Contec Corporation states there is no basis for distinguishing lease dispute cases with respect to the foregoing (Contec Response 17).

As for Remote's other arguments, Contec Corporation asserts (Contec Response 17-19) –

> 1.    Contec Corporation does not assert it is a third party beneficiary.
>
> 2.    Remote is obligated to defend Contec Corporation under Section 3(c) of the 1999 Agreement.
>
> 3.    The 1999 Agreement is not, by way of Section 19, confined to the original, signatory parties.
>
> 4.    Contec Corporation, as successor-in-interest, is entitled to pursue claims for indemnification, and Section 3(c) does not conflict with Section 13(a).

Finally, Contec Corporation contends that, pursuant to 9 U.S.C. §4, Remote Solution should be ordered to dismiss or stay its action in Korea against Contec Corporation (Contec Response 19-20). Contec Corporation argues that the Korean dispute arises under the 1999 Agreement.

C.    Remote's Reply

On October 30, 2003, Remote served and filed a reply to Contec Corporation's response. Remote submitted its reply under protest and with "full reservation of rights."

In addition, Remote submitted a Second Declaration, dated September 12, 2003, by Suk-Kyu Park, Remote's director. Mr. Park states that he erred in an earlier declaration in which he referred to Contec Corporation as entering into the 1999 Agreement.[2] He states the error was the result of "mis-communication". He states he was referring to Contec L.P.

Remote argues that the express contractual prohibition on assignments "by operation of

---

[2]    Presumably, the July 28, 2003 declaration filed in the Northern District action, in which Mr. Park stated (¶ 3): "Remote Solution and Contec Corporation ('Contec') entered in to a Manufacturing and Purchase Agreement, dated February 16, 1999 ... David K. Ahn of Hango Electronics, Inc. ... executed the Agreement on behalf of Remote Solution." Also, Mr. Park asserted the agreement was drafted by "Contec [Corporation]" (¶ 4), under the agreement, Remote assembled units for "Contec [Corporation]" (¶ 5), pursuant to the agreement, "Contec's [i.e. Corporation's] specifications were the property of Contec [Corporation]" (¶ 6), and Remote began shipping units "to Contec [Corporation] on September 28, 2000" (¶ 7).

law" bars transfers by merger (Remote Reply 1-2).  Remote states it has cited cases outside the landlord-tenant arena demonstrating that this is so.  Remote contends that Maryland authority cited by Contec Corporation was expressly distinguished by the same court.  Remote argues that ownership of the Contec entities is irrelevant.  The point is, says Remote, that Remote was never given the opportunity to determine whether it was "obligated to undertake the risk of different entities with potentially different economic structures" (Remote Reply 2).  Also, Remote asserts Contec Corporation has not shown what the "operation of law" language means, if not applicable to mergers (Id.).

Remote contends there has been no written consent to assignment to Contec Corporation (Remote Reply 2-5).  Remote argues that under the New York Convention (9 U.S.C. §201 et seq.), an assignment must be in writing signed by the parties or agreed in an exchange of letters or telegrams (Remote Reply 3).  Remote urges that documents "created by Contec" do not constitute writings by Remote (Id.).

Remote argues there is no evidence that Remote, "a Korean entity with little prior experience in the American market," knew or had any reason to understand that "Contec Corporation had undergone a corporate transformation" (Remote Reply 3).  Remote contends Contec Corporation failed to fulfil its obligation to notify Remote (Id.).

Remote contends that a course of dealing cannot establish an assignment under the New York Convention (Remote Reply 3).

Remote argues that unsigned purchase orders do not satisfy the New York Convention (Remote Reply 3-4).  Remote cites a Washington case for the proposition that "absent evidence in the writings that the parties agreed to arbitrate, no agreement can be imputed" (Remote Reply 4).  Remote asserts a "mere identification of another document does not automatically result in incorporation by reference," citing a Seventh Circuit case (Id.).  Remote argues that Remote "never signed the acknowledgment on the invoices," which signature Contec Corporation required (Id.).[3]  Remote argues that Contec Corporation has failed to produce the "back side" of the purchase orders (Id.).  Remote argues that "reference to a document for only certain purposes excludes incorporation of other provisions," citing a Second Circuit case (Id.).  Remote says the "invoice refers to the purchase orders to confirm quantities of goods sold and amounts owed" – the limit of incorporation (Remote Reply 4-5).

Remote contends that the New York Convention's requirement of a written agreement prohibits Contec Corporation from relying on waiver, estoppel and election of remedies (Remote Reply 5-7).  As for waiver, Remote iterates that agreement by a course of dealing is "outside the

---

[3]     Remote contends "There is nothing to suggest that [Remote], by referring to the invoices on the bill, intended to incorporate the language of the invoices which purport to incorporate the Agreement" (Remote Reply 4).  It appears that "invoices" should be – purchase orders – .

terms of the Agreement and the New York Convention" (Remote Reply 5). Remote contends Contec Corporation has failed to show equitable estoppel by clear and convincing evidence (Id.). Remote asserts Contec Corporation has failed to show Remote had any legal duty to speak, or Remote knew or had reason to know that Contec Corporation was "successor by merger" to Contec LLC (Remote Reply 5-6).

Remote argues Contec Corporation has failed to address the proposition that, in light of the non-waiver provision of the 1999 Agreement, "any reliance [by Contec Corporation] was not reasonable" (Remote Reply 6).

Remote contends that under New York law the doctrine of election of remedies is disfavored, citing New York authority (Remote Reply 6-7). Remote argues that, in the Korean action, Remote seeks payment from Contec Corporation, not Contec LLC, for goods shipped independent of the 1999 Agreement (Id.). Thus, argues Remote, there is no inconsistency.

Remote argues "no analysis under the terms of the Agreement itself is required," because Contec Corporation does not claim rights under the 1999 Agreement as a third party, but "only as an assignee by operation of law" (Remote Reply 7).

Remote contends that Contec Corporation has waived its right to arbitrate the issue of enjoining the Korean action because Contec Corporation filed suit in the Northern District of New York seeking the same relief (Reply Remote 7-8). Remote says Contec Corporation has cited no authority that arbitrators have power to issue injunctions in aid of arbitration (Remote Reply 7). Remote argues that Contec Corporation has not been served with process and is not in imminent danger of having to litigate in Korea (Id.). Remote argues the requested injunction should be denied "given the international implications, the lack of imminent harm, and Contec Corporation's clear willingness to have this issue decided in the judicial arena" (Remote Reply 8).

Remote concludes by contending Contec Corporation is wrong in asserting it is seeking recovery under the Agreement for amounts owed to its predecessors-in-interest (Remote Reply 8). Remote argues Contec Corporation is seeking indemnification for expenses Contec Corporation alone incurred in a lawsuit in which Contec Corporation, not its predecessors, was accused of patent infringement (Id.).

Remote asserts there is no signed arbitration agreement with Contec Corporation, no correspondence in which Remote accepted arbitration or application of the terms of the 1999 Agreement, and no evidence Remote intended to incorporate the 1999 Agreement into any subsequent documents (Id.).

D.    Contec Corporation's Response to Remote's Reply

On November 4, 2003, Contec Corporation served and filed its response to Remote's reply. The response purports to address new arguments in Remote's reply.

Page -11-

Contec Corporation argues –

1.  Disputed Maryland authority approves the proposition that, "depending on the circumstances, a mere change in corporate form may not constitute an assignment such that it violates a non-assignment provision." New York law does not distinguish between landlord-tenant and other contract disputes regarding the above rule. (Contec Resp to Reply 1)

2.  Remote's responses to the Contec entities' documents constitute Remote's writings that evidence Remote's consent (Id.).

3.  The New York Convention "has nothing to do with assignments" (Contec Resp to Reply 2). The cited portion of the New York Convention relates to the definition of an agreement to arbitrate, which has been satisfied here because Remote "does not dispute it signed the Agreement" (Id.).

4.  The Second Circuit Kahn Lucas case did not address whether purchase orders signed by one party together with invoices signed by the other party could constitute an arbitration agreement under the Convention (Id.).

5.  In the Washington Bothell case, in contrast to this case, there was no proof the party against whom enforcement of the arbitration agreement was sought was provided with the agreement (Contec Resp to Reply 2-3).

6.  Contec Corporation is not relying on incorporation by reference. Rather, Remote's consent is evidenced by Remote's acceptance in writing of purchase orders and development guidelines which on their faces were subject to the 1999 Agreement (Contec Resp to Reply 3).

7.  Nothing in Remote's invoices objects to the "plain statements on Contec's Purchase Orders that the orders were subject to the Agreement. [Remote] accepted all the terms applicable to the purchase orders by filling them." The invoices constitute written consent to the assignment (Id.).

8.  No issue relates to the back side of Purchase Orders. Remote could produce the back sides, if it wished to do so. (Contec Resp to Reply 4).

9.  Whether or not Contec Corporation can enforce the 1999 Agreement is governed by New York law, including doctrines of waiver, estoppel and election of remedies, not by the New York Convention (Id.).

10. Under the doctrine of election of remedies, the issue is what Remote did at the time of the alleged breaches because of the assignments. At those times,

Remote had a choice between terminating or continuing. Having chosen to continue, Remote cannot now assert termination (Contec Resp to Reply 4-5). The doctrine of election of remedies is "alive and well" re contract disputes (Contec Resp to Reply 5).

11.    Contec Corporation is not precluded from seeking injunctive relief in two forums (Id.). Contec Corporation is not asking the Court to consider the issue while the issue is being arbitrated. The 1999 Agreement authorizes the arbitrator to grant injunctive relief. The imminent danger of Contec Corporation's having to litigate in Korea cannot be in dispute (Id.).

12.    Contec has always sought recovery of amounts due to all three entities, citing pages 1-2 and 6-7 of its original response (Id.).

## IV.    DISCUSSION

### A.    Facts

Copies of documents accompanying various submissions show, inter alia, and I find, the following –

**1999**

| | |
|---|---|
| March 4, 1999 | Letter bearing Hango Electronics Co., Ltd.'s stamp with its president's signature to "Contec" confirming that David Ahn, President of Sango Electronics, Inc., is "our official representative and executive in U.S.A., and also, he is entitled to sign any kinds of documents and/or agreement including Manufacturing Agreement with your company on behalf of Hango Electronics Co., Ltd. in Korea."[4] |
| *February 16, 1999* | *Manufacturing and Purchase Agreement effective between Contec, L.P. and Hango Electronics Co., Ltd.* |
| August 18, 1999 | Hango Electronics invoice to "Contec" with items to be shipped to "Contec Limited Partnership". |

---

[4]    In his September 11, 2003 declaration filed in the Northern District action, David Ahn stated inter alia: "I have been given authority to sign documents for Remote Solution." He attached to his declaration a copy of the April 7, 2000 letter from Contec, referring to Contec LLC and the governing Manufacturing and Purchase Agreement of February 16, 1999. See April 7, 2000 entry, infra.

| | | |
|---|---|---|
| | *August 18, 1999* | *Contec, L.P. converted to limited liability company, known as Contec LLC.* |

**2000**

| | | |
|---|---|---|
| | April 7, 2000 | "Contec" letter to David Ahn, enclosing a purchase order Contec LLC is placing and stating in part: "This order is governed by the terms and conditions as defined in our Manufacturing and Purchase Agreement of February 16, 1999." |
| | May 10, 2000 | Hango (dba Remote Solution) invoice to Contec LLC. |
| | July 21, 2000 | Hango Purchase Quotation with Contec LLC, signed by David Ahn and stated to be "covered by all terms and conditions defined in the Manufacturing and Purchase Agreement dated February 19 [sic], 1999 between Contec and Hango." |
| | August 7, 2000 | Remote Solution invoice to Contec LLC. |

**2001**

| | | |
|---|---|---|
| | *January 1, 2001* | *Contec LLC merged into Contec Corporation, the surviving entity.* |
| | January 31, 2001 | Contec Corporation Purchase Order to Remote Solution. |
| | March 21, 2001 | Hango Electronics Co., Ltd. invoice to Contec Corporation. The invoice bears the stamped signature of Hango's president.[5] |
| | March 30, 2001 | "Contec" wrote to David Ahn, regarding development of RT-U49 and stating in part: "All development is governed by the Manufacturing Agreement between Contec and Hango." |

---

[5]    In his July 28, 2003 declaration, Mr. Park declares Remote began shipping to "Contec [Corporation]" under the 1999 Agreement on September 28, 2000 (¶ 7). Invoices to Contec, L.P. and Contec LLC before September 28, 2000 suggest that Mr. Park erred on this score, regardless of the Contec entity Mr. Park may have had in mind.

| | |
|---|---|
| April 12, 2001 | Contec Corporation Purchase Order P045431-00 to Remote Solution, stating in part: "This purchase order is governed by manufacturing agreement with Contec." |
| May 9, 2001 | Hango Electronics Co., Ltd. Commercial Invoice to Contec Corporation, re inter alia "P/O No: P045431-00" and bearing Hango Electronics Co., Ltd. stamp with president's signature. |
| August 24, 2001 | Contec Corporation Purchase Order to Hango Electronics Co,. Ltd., stating in part: "This purchase order is governed by manufacturing agreement with Contec." |
| September 6, 2001 | "Contec [redacted] Remote Control System/Project", stating in part: "Work done under this request is governed by the manufacturing agreement between both parties." This was apparently sent to Hango/Remote. |
| November 21, 2001 | Contec email to Hango, regarding development of model for DirecTV and enclosing inter alia "Development Guidelines". |
| November 21, 2001 | "Contec" wrote to David Ahn requesting that Hango proceed with the development for DirecTV and stating under General Guidelines, in part: "All development is governed by the Manufacturing Agreement between Contec and Hango." |

**2002**

| | |
|---|---|
| April 4, 2002 | Contec Corporation Purchase Order to Remote Solution, stating in part: "This purchase order is governed by manufacturing agreement with Contec." |
| April 12, 2002 | "Contec" wrote to David Ahn et al, regarding a new development project and stating under "General Guidelines" in part: "All development is governed by the Manufacturing Agreement between Contec and Hango." |
| October 7, 2002 | Contec Corporation Purchase Order to Remote Solution, stating in part: "This purchase order is governed by manufacturing agreement with Contec." |

| | |
|---|---|
| November 12, 2002 | Contec Corporation Purchase Order to Remote Solution, stating in part: "This purchase order is governed by manufacturing agreement with Contec." |
| November 22, 2002 | Contec Corporation Purchase Order to Remote Solution, stating in part: "This purchase order is governed by manufacturing agreement with Contec." |
| December 4, 2002 | Two Contec Corporation Purchase Orders to Remote Solution, each stating in part: "This purchase order is governed by manufacturing agreement with Contec." |
| December 10, 2002 | Contec Corporation Purchase Order to Remote Solution, stating in part: "This purchase order is governed by manufacturing agreement with Contec." |
| December 23, 2002 | Contec Corporation Purchase Order to Remote Solution. |
| December 23, 2002 | Contec Corporation Purchase Order to Remote Solution, stating in part: "This purchase order is governed by manufacturing agreement with Contec." |

**2003**

| | |
|---|---|
| June 13, 2003 | Remote's Korean bill of complaint avers inter alia that, "pursuant to" a November 22, 2002 Purchase Order from Contec Corporation, Remote designed and produced 14,000 units and completed shipment on December 27, 2002 (¶ 2.(a)). Remote avers also that Contec Corporation was obligated to pay pursuant to various purchase orders. |

From the foregoing it appears that, notwithstanding the changes in form of the Contec entities, from February 16, 1999 through December 2002, Remote accepted and filled purchase orders, first from Contec L.P., then Contec LLC, and finally, Contec Corporation. At least ten of those purchase orders expressly stated "this order is governed by the manufacturing agreement with Contec." In addition, each of Contec L.P., Contec LLC, and Contec Corporation wrote to Remote under the title of the Contec entity as it then existed. Also, Remote replied with at least one invoice to Contec L.P., two invoices and a purchase quotation to Contec LLC, and two invoices to Contec Corporation – one of which expressly confirmed the applicability of the 1999 Agreement (July 21, 2000 Purchase Quotation).

Also, on at least four occasions, Contec LLC or Contec Corporation wrote to Remote expressly stating work to be done is governed by the 1999 Agreement. Nothing in this record

evidences any question, much less objection, by Remote to any of the repeated assertions that the 1999 Agreement governed the development work by, or purchases from, Remote – or Remote's deliveries of units to any Contec entity.

      B.    <u>Analysis</u>

      I have considered carefully the submissions of each party, together with the accompanying documents, the demand for arbitration and cited authorities.

      It is beyond dispute that the 1999 Agreement contains an arbitration clause. That clause was agreed to by Hango Electronics Co., Ltd. (now "Remote") and Contec L.P. Thus, as far as Contec L.P. is concerned, it was a party to a written arbitration agreement.

      It is also beyond dispute that the 1999 Agreement contained inter alia (1) a non-assignment provision (Section 21), (2) a prohibition against waiver except in writing (Section 23), and (3) a prohibition against modification except in writing (Section 24).

      If there were a breach by one or more Contec entities of the 1999 Agreement, they twice breached the Section 21 non-assignment provision of the 1999 Agreement – first, when Contec LLC began to operate under the 1999 Agreement; second, when Contec Corporation began to operate under the 1999 Agreement.

      At minimum, Remote was aware of the name changes. Repeated contemporaneous written references to the current Contec entity make this plain. The record before me does not reveal what significance Remote attributed to those changes. It is not unreasonable to expect that, if Remote were misled or prejudiced somehow by the name changes, a contemporaneous document would have reflected that fact. It is likely Remote would have submitted a declaration or affidavit by a knowledgeable Remote officer. Nothing like this has occurred. Counsel's ipse dixit as to Remote's naivete carries no weight. This is especially so, when the contemporaneous record, together with the Remote declarations and averments in pending litigations, shows repeatedly that Remote understood the 1999 Agreement applied continuously from its effective date to all of Remote's work with and sales of units to a Contec entity, including Contec Corporation.

      The contemporaneous documents make it clear that, after each name change, Remote continued to do business with Contec LLC and with Contec Corporation pursuant to the 1999 Agreement. For example, as revealed in this record –

            Remote invoiced Contec LLC in 2000 three times, and once in 2000, transmitted to
            Contec LLC a Purchase Quotation signed by David Ahn and expressly "covered by

all terms an conditions defined in the Manufacturing and Purchase Agreement dated February 19 [sic], 1999 between Contec and Hango."[6]

Remote received from Contec LLC in 2000 a Contec, LLC purchase order, stating in part: "This order is governed by the terms and conditions as defined in our Manufacturing and Purchase Agreement of February 16, 1999."

Remote twice invoiced Contec Corporation in 2001.

Remote received at least twelve purchase orders from Contec Corporation in 2001 and 2002, ten of which stated: "This purchase order is governed by manufacturing agreement with Contec."[7]

Remote received two letters from "Contec" in 2001 stating "All development is governed by the Manufacturing Agreement between Contec and Hango."[8]

In addition, in connection with various actions in various courts –

On May 23, 2003, Remote's counsel in this arbitration served a cross-claim on behalf of Remote in the Philips action against "Contec Corporation ('Contec')", averring: "The remote control devices at issue here were built by [Remote], pursuant to a contract between [Remote] and Contec [i.e. Contec Corporation]."

In Remote's June 13, 2003 bill of complaint in its Korean action, Remote refers to the November 22, 2002 purchase order from Contec Corporation, and avers: "Pursuant to the purchase order, Plaintiff designed and produced 14,000 ... [units]." Remote averred Contec Corporation had not paid the amount due "in accordance with the Purchase Order."[9]  Remote referred to additional purchase orders from

---

[6]    It is agreed there is only one Manufacturing and Purchase Agreement.  It is effective February 16, 1999.  Neither party to this arbitration suggests that this Hango Purchase Order refers to any agreement other than the February 16, 1999 Agreement.

[7]    Neither party suggests that this statement refers to any agreement other than the February 16, 1999 Agreement.

[8]    Neither party suggests that this statement refers to any agreement other than the February 16, 1999 Agreement.

[9]    This purchase order appears at the November 22, 2002 entry, supra.  It expressly states: "This purchase order is governed by manufacturing agreement withe Contec."

Page -18-

Contec Corporation, apparently summarized in an attachment and totaling 20 in number. As we have seen, Contec Corporation purchase orders are expressly conditioned on the terms and conditions of the 1999 Agreement.

On July 28, 2003, Remote's director Suk-Kyu Park stated in a declaration submitted in the New York action: "Remote Solution and Contec Corporation ('Contec') entered into a Manufacturing and Purchase Agreement, dated February 16, 1999 ... ."[10]

In September 2003, Remote submitted David Ahn's September 11, 2003 declaration, attaching a copy of the April 7, 2000 letter referring to Contec LLC and the 1999 Agreement. Mr. Ahn describes the letter as from "Harry Mickey of Contec, L.P."

Thus, as recently as May and July of this year, in solemn submissions in two separate actions, Remote has characterized the 1999 Agreement as between Remote and Contec Corporation. These post litem statements deserve substantial weight.

Remote elected to continue to do business on a regular, recurring basis with each Contec entity, including Contec Corporation, notwithstanding clear expressions in written communications and formal sales documents that, at minimum, a Contec entity had undergone some change. The fact that a change had occurred was unmistakably evident from the contemporaneous documents. This afforded Remote a fair opportunity to evaluate risks and make informed decisions. Under New York law (the governing law according to Section 25 of the 1999 Agreement), and in light of its election, Remote cannot now urge that Contec Corporation is neither bound by the 1999 Agreement nor permitted to enforce the Agreement. Remote continued to do business with Contec Corporation pursuant to the 1999 Agreement for at least two years after Contec Corporation was formed, and its change of name was apparent to Remote. It is now too late for Remote to contend that the 1999 Agreement has been breached by the assignment to Contec Corporation. This is so regardless of whether Remote is viewed as having waived or having elected. ESPN, Inc. v. Office of the Commissioner of Baseball, 76 F. Supp.2d 383, 387-88 (S.D.N.Y. 1999).

Contec Corporation stands in the shoes of its predecessor entities and is properly a party to the 1999 Agreement and its arbitration clause. By accepting (in writing, by way of Remote's own invoices) the terms of the various purchase orders from Contec Corporation, filling those orders, and now claiming that Remote is owed money under those orders, Remote has repeatedly acknowledged the applicability of the 1999 Agreement to its business dealings with Contec

---

[10]    Mr. Park's second declaration, asserting that his references to Contec Corporation were the result of "mis-communication", does not deserve persuasive weight. The second declaration is plainly the product of counsel's attempt to make the best of a bad situation.

Corporation. Remote's claims against Contec Corporation are clearly not independent of the 1999 Agreement. Rather, Remote's claims are intimately intertwined with the 1999 Agreement, because Contec Corporation's purchase orders were expressly subject to the 1999 Agreement. It is no less appropriate for the terms and conditions of the 1999 Agreement to apply to Contec Corporation purchase orders than any other terms and conditions referred to in the purchase orders.

As a result of standing in its predecessors' shoes, Contec Corporation is a party to the 1999 Agreement and its arbitration clause. Accordingly, no issue concerning a written agreement to arbitrate arises under the New York Convention.

Having arrived at the conclusions I have stated above, I find no need to deal with other arguments raised by the parties.

C.    Remote's Korean Action

Under the arbitration clause of the 1999 Agreement and New York law, it is clear that I have authority to issue an award enjoining Remote from proceeding with the Korean action pending the outcome of this arbitration on the merits.

The subject matter of the Korean action, as revealed by the bill of complaint, is a controversy arising with respect to the 1999 Agreement. In light of my conclusion that Contec Corporation is entitled to enforce the 1999 Agreement and to proceed with this arbitration, it is entirely appropriate that Remote be required to take steps necessary to effect a stay or to dismiss its action in Korea, pending the outcome of this arbitration on the merits.

## V.    Award

Having considered all of the submissions of the parties, and in light of the foregoing discussion, I rule that (1) Contec Corporation is entitled to enforce the 1999 Agreement and to proceed with this arbitration on the merits, and (2) Remote is enjoined from prosecuting or otherwise permitting the Korean action to go forward, pending the outcome of this arbitration on the merits.

At this stage of the proceedings and in light of all the circumstances, and mindful of the provisions of Section 19 of the 1999 Agreement,[11] I rule that the parties should bear their own costs incurred in connection with this proceeding to date.  I shall reconsider this matter at the conclusion of this proceeding.

December 1, 2003                           _____
                                                           David W. Plant, Arbitrator

---

[11]    Section 19 provides, in part: "The prevailing party ... will be entitled to recover from the other party all of its expenses, including, without limitation all expenses due and payable to the AAA and such party's fees and expenses for witnesses, the arbitrators and its attorney's fees incurred in the conduct of such arbitration ... ."

RECEIVED

DEC 0 5 2003

INTERNATIONAL CENTER