# MANUFACTURING AND PURCHASE AGREEMENT

This MANUFACTURING AND PURCHASE AGREEMENT made, entered into, and effective as of this 16 day of February, 1999, by and between CONTEC, L.P., a New York limited partnership with its principal place of business at 1023 State Street, Schenectady, New York 12307 (hereinafter referred to as "Purchaser"), and Hango Electronics Co., Ltd., a Korean corporation with its principal place of business at #880, Kyo-Dong, Kim Chon City, Kyung Buk, Korea (hereinafter referred to as "Seller").

## RECITALS

A. Seller designs, manufactures and sells remote control units for interface with cable TV convertors ("RCU's").

B. Purchaser operates a business whereby, among other things, it supplies RCU's to operators of cable TV systems and other customers.

C. Purchaser wishes to engage Seller to design and manufacture RCU's for Purchaser and to sell RCU's to Purchaser pursuant to the terms and conditions of this Agreement.

## AGREEMENTS

NOW, THEREFORE, in consideration of the premises and the mutual promises and covenants hereinafter set forth, the parties hereto, intending to be legally bound, do mutually agree as follows:

1. DESIGN OF PRODUCTS.

   (a) Purchaser will provide Seller with specifications (which may or may not include design parameters, functionality, layout and overlay) with respect to RCU's to be designed, manufactured and sold pursuant to this Agreement. Seller will thereupon design an RCU in accordance with such specifications. (RCU's designed and/or manufactured and sold by Seller to Purchaser pursuant to this Agreement are referred to herein as "Products").

   (b) Products shall be designed by Seller for Purchaser by Purchase Order. Unless otherwise specified in Purchaser's purchase order, all design services shall be provided by Seller to Purchaser without charge. All Purchase Orders shall be subject to Purchaser's General Terms and Conditions a copy of which is attached as Exhibit A ("General Terms and Conditions"). Purchaser reserves the right to amend its General Terms and Conditions from time to time in its sole discretion.

C003988

**HIGHLY CONFIDENTIAL**

2. PURCHASE AND SALE OF PRODUCTS.

(a) Seller shall sell to Purchaser and Purchaser shall purchase from Seller, the Products at the prices as may be agreed from time to time. Seller shall not sell remote controls designed for Purchaser to any other person without Purchaser's written consent, which consent may be withheld in Purchaser's sole and unfettered discretion.

(b) Products are to be ordered by purchase order. Purchase orders for Products shall be in writing and shall state the Products ordered by model number and shall indicate the prices, quantities and requested shipping schedules. All purchase orders shall be subject to Purchaser's General Terms and Conditions.

(c) Seller shall accept any purchase order for Products with a reasonable delivery requirement issued pursuant to this Agreement provided that the purchase order is consistent with the annual sales forecast agreed upon by Seller and Purchaser.

(d) Unless otherwise agreed in writing by both parties payment for the Products shall be made thirty (30) days from the date of shipment.

(e) The purchase and sale of Products shall be governed exclusively by the terms and conditions of this Agreement. In the case of any inconsistency between this Agreement, the General Terms and Conditions and Purchaser's purchase order, such inconsistency shall be resolved first to give effect to the typed or written provisions (as opposed to the preprinted provisions) of a purchase order of Purchaser which has been accepted by Seller in writing, next to give effect to this Agreement, then to the General Terms and Conditions and finally to the preprinted provisions of Purchaser's purchase order.

(f) Shipment shall be made to Purchaser's warehouses or directly to Purchaser's customer as specified by Purchaser from time to time, and title to Products shall pass to Purchaser upon delivery to the carrier F.O.B. point of shipment. All shipping costs to the port designated by Purchaser shall be responsibility of Seller. Upon delivery to the Purchaser's carrier at the port identified by Purchaser, all risk of loss or damage and responsibility to file claims shall be Purchaser's. Ownership of Products shall not be transferred to Purchaser at any other place or time, regardless of the time, method, place, medium of payment, the method of shipment, the payment of transportation charges or insurance, or any statement contained in, or implication drawn from, the shipping documents or any other documents relating to the sale.

(g) Purchaser may sell Products at prices and terms established at its own discretion. Purchaser's profits shall be from its resale of Products.

HIGHLY CONFIDENTIAL

CC03989

3. INTELLECTUAL PROPERTY MATTERS AND INDEMNIFICATION.

(a) All of the following items, if supplied by Purchaser to Seller are considered Purchaser's proprietary, confidential information or if developed by Seller in connection with its performance of its obligations pursuant to this Agreement are considered work for hire on behalf of Purchaser and shall be and are the Purchaser's proprietary, confidential information and property:

(i) RCU designs (including conceptual designs), specifications, overlays, functionality and layout;

(ii) Plastic case designs;

(iii) Software code; and

(iv) Semiconductor-chips

(All of the foregoing is referred to as "Proprietary Information").

Seller shall and hereby does assign to Purchaser all of its rights in and to the Proprietary Information. Seller agrees to perform all reasonable acts and execute all necessary or appropriate documents and otherwise provide proper assistance so as to vest title to the Proprietary Information in Purchaser and so as to enable Purchaser to obtain for itself or its nominees patents, copyrights and other legal protection for the Proprietary Information.

(b) All Propriety Information is for Purchaser's exclusive use. Seller shall make no use whatsoever of any the Proprietary Information without the prior written consent of Purchaser which consent may be withheld in Purchaser's sole and unfettered discretion.

(c) Seller shall defend any suit or proceeding brought against Purchaser to the extent that such suit or proceeding is based on a claim that the Products constitute an infringement of any valid United States or foreign patent, copyright, trade secret or other intellectual property right and Seller shall pay all damages and costs awarded by final judgment against Purchaser.

If any of the Products designed, manufactured and/or supplied to Purchaser hereunder shall be held to infringe any valid United States or foreign patent copyright, trade secret or other intellectual property right and the use of same is enjoined, or if Seller believes such a holding is likely, Seller shall, at its option and at its expense, have the right: (I) to procure for Purchaser and its customers the right to use such goods free of liability for infringement or (ii) to replace (or modify) the Products with a non-infringing substitute otherwise complying with all the requirements of this Agreement.

HIGHLY CONFIDENTIAL
CC03990

4. PRODUCT WARRANTY.

(a) Seller warrants that, for a period of three (3) years from date of acceptance by Purchaser, all Products shall be free from defects in materials and workmanship and shall conform to all Purchaser orders, specifications, design parameters and to Purchaser's Remote Control Design Requirements Document RD-001, Rev. A. In addition, Seller warrants that for a period of one (1) year from the date of manufacture of Product (as specified by the bar code found inside the battery compartment) the software code library in the Product shall have been current as of said date of manufacture. This warranty applies to the Purchaser and its successors in interest and its customers. This warranty does not apply to cosmetic damage or to any damages or defects arising from natural disasters, lightning strikes, electrical surges, normal wear, damage due to liquids, negligence, improper maintenance or misuse. In addition, this warranty does not cover any damages or defects due to non-authorized modifications, repairs, additions or deletions of components.

(b) Seller's liability in the event of breach of warranty shall be as follows:

(i) replace any and all defective or nonconforming Product;

(ii) if Seller is not able to replace the defective or nonconforming Product within a reasonable time, refund the purchase price plus shipping and duty costs of the Product;

(iii) if the out of box failure rate for any model of Product exceeds one percent (1%) of such model from any shipping lot(s), as determined by date code, Seller, at its expense, shall immediately ship to Purchaser replacement Product in an amount equal to one hundred ten percent (110%) of the experienced out of box failure rate of such model of Product delivered to Purchaser in the shipment lot(s) from which the failed or defective Product was taken and all subsequent shipping lots containing the defect until the problem(s) are corrected; or

(iv) in the event of an Epidemic Failure (as hereinafter defined), Purchaser may, at its sole option, either

(A) reject the entire lot of Product subject to Epidemic Failure and require Seller to refund the purchase price therefor; or

(B) require Seller to inspect all units of Product in the lot of Product and replace all defective units with conforming units.

For purposes of the foregoing the term "Epidemic Failure" means: (i) failure

4 of 13

HIGHLY CONFIDENTIAL
CC03991

of three percent (3%) or more of any model of Product from any shipping lot(s), as determined by date code in any three (3) month period due to the same cause; or (ii) failure of five percent (5%) of any model of Product from any shipping lot(s), as determined by date code, in any twelve (12) month period regardless of cause.

(c) All shipping, handling and similar charges incurred in connection with defective Product shall be borne by Seller.

(d) The warranties contained herein are not sole and exclusive but are in addition to, and do not limit, any rights afforded Purchaser by law.

5. **MOLDS.** All molds for plastic case designs developed by Seller at Purchaser's request are the property of Purchaser and shall be surrendered to Purchaser at its request.

6. **TESTING.** All Products are subject to testing in accordance with Purchaser's Remote Control Design Requirements Document RD-001 Rev A.

7. **TERM AND TERMINATION.**

(a) Unless terminated in accordance with Sections 7(b), 7(c) or 7(d) of this Agreement, the term of this Agreement shall be indefinite.

(b) Either party may terminate this Agreement at any time upon one hundred twenty (120) days written notice to the other party.

(c) This Agreement may be terminated at the election of either party in the event the other party has failed to cure any default in the performance of its obligations under this Agreement within thirty (30) days after the delivery of written notice of such default by the first party.

(d) Unless otherwise prohibited by law, this Agreement shall terminate automatically, with no requirement of notice, if any of the following occurs:

(i) Either party makes an assignment for the benefit of its creditors;

(ii) Either party becomes insolvent, or voluntary or involuntary proceedings are instituted against either party under any federal, state or other bankruptcy or insolvency law, or a receiver is appointed for either party;

(iii) Either parties' business is placed under attachment,

C003992

HIGHLY CONFIDENTIAL

garnishment or other restrictive process involving a significant portion of the business of either party; or

(iv) Either party ceases to function as a going concern or ceases to conduct is business operations.

(e) This Section 7 shall not limit any legal right or remedy which either party might otherwise have at law or in equity with respect to any breach by the other party of the provisions of this Agreement.

8. SALES AFTER TERMINATION. The acceptance of any order from, or the sale of Products to, Purchaser after the termination or expiration of this Agreement shall not be construed as a renewal or extension hereof nor as a waiver of termination, but the terms and conditions of sale of such transactions shall be governed by provisions identical with the provisions of this Agreement.

9. DELIVERIES AFTER TERMINATION.

(a) Except as provided by subparagraph (b), below, after a date for termination of this Agreement is established by notice or agreement, pursuant to Section 7, (unless another agreement in writing relating to Products shall then be in effect) Seller shall be obligated to deliver, and Purchaser shall be obligated to accept, only such Products as Purchaser shall have ordered from Seller prior to establishment of a date for termination provided, however, that in no event shall Seller be obligated to deliver, or Purchaser be obligated to accept, any Products after the date of termination.

(b) Upon termination of this Agreement for any reason, Seller shall upon Purchaser's request, promptly deliver to Seller all molds used in the manufacture of plastic cases for Products. Such transfer shall be effected without cost to Purchaser.

(c) Upon termination of this Agreement for any reason, Seller shall, at Purchaser's request, identify the manufacturer of all semiconductors used in Products and provide Purchaser with written authorization to the manufacturers of such semiconductors so that manufacturer may sell such semiconductors directly to Purchaser or the Purchaser's designee. Upon Seller's compliance with this subsection, Purchaser shall pay to Seller the amount determined pursuant to the following table for semiconductors developed explicitly for Purchaser, or for semiconductors that would not normally be available to Purchaser by the manufacturer without Seller's written authorization:

HIGHLY CONFIDENTIAL

C003993

| Number Of Units Of Product Purchased From Inception To Date of Terminations | Consideration |
|---|---|
| ■■■ | ■■■ |

For purposes of the foregoing, consideration shall be computed separately for each semiconductor and all models of Product using a given semiconductor shall be aggregated. If manufacturer refuses to sell semiconductors directly to Purchaser for any reason, the above consideration will not be paid. If, for any reason, the semiconductor manufacturer refuses to supply semiconductors to Purchaser, Seller will, at Purchaser's option:

i) Continue to purchase and resell the semiconductors to Purchaser for an amount equal to Seller's cost for the semiconductors plus  for a period of up to 6 months, and

ii) Supply Purchaser with the software code stored in the semiconductor so that Purchaser may have the semiconductor duplicated by another manufacturer.

10. LATE DELIVERY PENALTY. If, after providing the purchaser with a confirmation of Product delivery dates, Seller is unable to deliver Product in a timely manner, Purchaser may, at its discretion, impose the following penalties:

a) If delivery is more than 2 weeks late, Seller will credit Purchaser for 2% of the cost of the Product that is late and will credit Purchaser for an additional 1% for each additional week Product is delivered late to Purchaser up to a maximum of 20%, or

b) Purchaser may require Seller to ship Product that is more than 2 weeks late by air express at the expense of the Seller, or

c) Purchaser may cancel any purchase order than is more than 3 weeks late to scheduled delivery.

11. NO LIABILITY FOR TERMINATION OR NON-RENEWAL. Neither Seller nor Purchaser shall, by reason of the termination or non-renewal of this Agreement, be liable to the other for compensation, reimbursement or damages on account of the loss of prospective profits, goodwill or anticipated sales, or on account of expenditure, investments, leases or commitments in connection with the business or good will of Seller or Purchaser, or otherwise.

12. INSURANCE. At all times during the term of this Agreement and any extension or renewal hereof, each party shall, at its expense, maintain in effect, in amounts and coverage, and with insurance companies reasonably satisfactory to the other party, the following types of insurance: labor and employer's liability (including any

HIGHLY C003994
CONFIDENTIAL

THIS PAGE CONTAINS PARTIALLY REDACTED MATERIAL

liability for personal injury, death or property damage of or by its employees), comprehensive general public liability insurance for all risks (including facilities, operations, products, services, contractual liability and automobile liability insurance), all in amount reasonably satisfactory to the other party as will adequately protect both parties from claims for property damage, personal injury including death, theft, and other liabilities which may arise or result from or under this Agreement. Each party shall furnish to the other party certificates of such insurance which provide that a minimum of 30 days written notice of any expiration, termination, cancellation or modification be given to the other party.

13. **INDEMNIFICATION; LIMITATION OF LIABILITY.**

(a) Each party shall indemnify and hold harmless the other party, its shareholders, directors, officers, employees, agents, designees and assignees, or any of them, from and against all losses, damages, liabilities, expenses, costs, claims, suits, demands, actions, causes of actions, proceedings, judgments, assessments, deficiencies and charges (collectively, "Damages") caused by, relating to, or arising from a default in the performance by such party in accordance with this Agreement of its obligations hereunder, or a breach of its obligations hereunder, or a breach of its warranties or representations as made herein. In the event of a claim with respect to which a party may be the indemnified party hereunder, such party (the "Indemnified Party") shall notify the other party (the "Indemnifying Party") in writing as soon as practicable, but in no event later than thirty (30) days after receipt of such claims. The Indemnified Party's failure to provide such notice shall not preclude it from seeking indemnification hereunder unless such failure has materially prejudiced the Indemnifying Party's ability to defend such claim. The Indemnifying Party shall promptly defend such claim (with counsel of its own choosing) and the Indemnified Party shall cooperate with the Indemnifying Party in the defense of such claim, including the settlement of the matter on the basis stipulated by the Indemnifying Party (with the Indemnifying Party being responsible for all costs and expenses of such settlement). If the Indemnifying Party within a reasonable time after notice of a claim fails to defend the Indemnified Party, the Indemnified Party shall be entitled to undertake the defense, compromise or settlement of such claim at the expense of the Indemnifying Party. Upon the assumption of the defense of such claim, the Indemnifying Party may settle, compromise or defend as it sees fit.

(b) IN NO EVENT SHALL EITHER PARTY HEREUNDER BE LIABLE TO THE OTHER OR TO ANY PERSON OR ENTITY NOT A PARTY TO THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR BASED UPON ANY BREACH OF CONTRACT, VIOLATION OF STATUTE, NEGLIGENCE, STRICT LIABILITY OR ANY OTHER LEGAL THEORY.

14. **CONFIDENTIALITY.** Seller agrees to keep secret and not disclose to

HIGHLY CONFIDENTIAL
C003995

others nor make use of any confidential information concerning Purchaser's products or business, which may have become known to Seller during the course of the Seller's relationship with Purchaser and at any time thereafter. Upon termination of this Agreement, Seller agrees forthwith to deliver to Purchaser any and all literature, documents, data, information, samples, software, price lists, and all other property belonging to Purchaser or relating to Purchaser's business.

15. **FORCE MAJEURE.**

(a) Neither party shall be liable for failure or delay in shipping Products hereunder if said failure is due to an act of God, fire, flood, sabotage, war, riot, insurrection, civil disorder, embargo, act of any civil and/or military authority, priorities granted at the request or for the benefit directly or indirectly of any governments. Delivery shall be deemed suspended upon notice to the other party by the non-performing party.

(b) Each party shall use its best efforts to lift the force majeure and agree to work with the other to arrive at, to the extent practicable, a resolution to achieve the purpose of this Agreement.

(c) The non-performing party shall presume performance as soon as the force majeure ceases or is terminated.

16. **COMPLIANCE WITH LAWS.** Seller represents that any and all Products to be sold pursuant to this Agreement are designed, manufactured and sold in accordance with all applicable laws and regulations including, without limitation, all labor laws and that no forced or prison labor has been used in connection therewith.

17. **AUTHORITY TO BIND.** No agent, employee, or representative of either party has any authority to bind the said party to any affirmation, representation, or warranty concerning the Products sold under this Agreement and unless an affirmation is specifically ratified by the party and included within this Agreement, it is not part of the basis of the bargain and shall not be enforceable against the party. Nothing contained in this Agreement shall be construed as constituting the relationship of the parties to be one of agent/principal, partner, joint venture or employee/employer, or cause either party to be liable for any of the debts or obligations of the other, nor shall either party have the right or authority to act for or incur any liability or obligation of any kind, express or implied, in the name of or on behalf of the other party hereto.

18. **SURVIVAL.** Whenever an obligation, responsibility or duty of either party under this Agreement extends beyond the completion of its performance or the termination of this Agreement, such obligation, responsibility or duty shall continue in full force and effect without regard to such completion of performance or termination.

19. **DISPUTES.** In the event of any controversy arising with respect to this

HIGHLY CONFIDENTIAL   C003996

Agreement, both parties shall use its best efforts to resolve the controversy. In the event the parties are unable to arrive at a resolution, such controversy shall be determined by arbitration held in the City of Albany, New York in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") or any organization that is the successor thereto using arbitrators knowledgeable in the CATV telecommunications industry and who will follow substantive rules of law. The dispute shall be determined by an arbitrator acceptable to both parties who shall be selected within fifteen (15) days of filing notice of intention to arbitrate. Otherwise, the dispute shall be determined by a panel of three arbitrators selected as follows: Within fifteen (15) days of filing notice of intention to arbitrate, each party shall appoint one arbitrator, these selected arbitrators will then name a third arbitrator, who shall be an attorney admitted before the bar of any state of the United States, to preside over the panel. If either party fails to appoint any arbitrator, or if the two arbitrators do not name a third arbitrator within fifteen (15) days, either party may request the AAA to appoint the necessary arbitrators) pursuant to Rule 13 of the Commercial Arbitration Rules. No arbitrators may be affiliated or employed by either party and the arbitrators shall have full authority, including authority to grant specific performance, injunctive or other equitable relief <u>provided</u> that this Section 21 shall in no way affect the right of any party to seek interim equitable relief to maintain the status quo in aid of the arbitration in any court of competent jurisdiction. Arbitrators shall be compensated for their services at the standard hourly rate charged in their private professional activities. All testimony shall be transcribed. The prevailing party in any such situation will be entitled to recover from the other party all of its expenses, including, without limitation, all expenses due and payable to the AAA and such party's fees and expenses for witnesses, the arbitrators and its attorney's fees incurred in the conduct of such arbitration but in no event will the recovery of its attorney's fees be in excess of the actual cost of the other party's attorney's fees. The award of the panel shall be accompanied by findings of fact and a statement of reasons for the decision. All parties agree to be bound by the results of this arbitration and such arbitration decision shall constitute an award by the arbitrators within the meaning of the AAA notes and applicable law: judgment upon the award so rendered may be entered and enforced in any court of competent jurisdiction. To the extent reasonably practicable, both parties agree to continue performing their respective obligations under this Agreement while the dispute is being resolved.

20. **NO THIRD PARTY BENEFICIARIES.** This Agreement is not intended to benefit any third person other than Purchaser and Seller.

21. **NON-ASSIGNMENT.** This Agreement, and any interest herein, may not be assigned by either party, whether by operation of law or otherwise, without the prior written consent of the other party, which consent shall not be unreasonably withheld.

22. **SEVERABILITY.** If any of the provisions of this Agreement is declared or found to be illegal, unenforceable or void, the remaining provisions of this Agreement shall continue in full force and effect and shall be enforceable to the extent permitted by

HIGHLY C003997
CONFIDENTIAL

law. As to any illegal, unenforceable or void provision; the rights and obligations of the parties shall be construed and enforced through a valid commercially reasonable term consistent with the undertakings of the parties under the order has been substituted in place of the invalid provision.

23. WAIVER. Failure to insist upon strict performance of any of the terms or conditions of this Agreement by either party shall not constitute a waiver of such terms and conditions or a waiver of any default by the other party. No waiver or modification of any of the foregoing terms and conditions shall be effective unless such waiver or modification is in writing and signed by an authorized representative of both parties.

24. FULL AGREEMENT. This Agreement is intended by the parties as the final expression of their agreement as a complete and exclusive statement of its terms with respect to the subject matter hereof and supersedes and cancels any prior agreement or understandings, oral or written, with respect thereto. No other representations, understandings, or communications shall be included in this Agreement, other than those specifically set forth herein. This Agreement may only be modified or altered in writing executed by the parties hereto.

25. GOVERNING LAW. This Agreement shall be governed by the laws of the State of New York applicable to contracts to be fully performed therein.

26. NOTICES. All notices required or permitted hereunder shall be in writing and shall be deemed duly given when personally delivered or when received if sent by Registered or Certified Mail, Return Receipt Requested, Postage Prepaid, or by cable or FAX when confirmed by letter as aforesaid, as follows:

To Purchaser:    Harry Mickey
                 Contec, L.P.
                 1023 State Street
                 Schenectady, New York 12307
                 FAX: (518) 382-8452
                 Phone: (518) 382-8000

With a copy to:  Richard A. Langer, Esq.
                 McNamee, Lochner, Titus & Williams, P.C
                 75 State Street, P.O. Box 459
                 Albany, New York 12201-0459
                 FAX: (518) 447-3341
                 Phone: (518) 447-3200

HIGHLY CONFIDENTIAL
C003998

To Seller:   Hango Electronics Co., Ltd.
             #880, Kyo-Dong, Kim Chon City,
             Kyung Buk, Korea
             FAX: 82-547 432-4329

With a copy to:   _____
                  _____
                  FAX: _____

or such other address as either party may hereafter designate in writing by like notice.

IN WITNESS WHEREOF the parties hereto have signed this Agreement on the day and year first above written.

CONTEC, L.P.

By: *Harry R. Mickey*
Title: Vice President

HANGO ELECTRONICS CO. LTD.

By: *DAVID AHN*
Title: GENERAL MANAGER

C003999

HIGHLY CONFIDENTIAL