AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| CONTEC CORPORATION, | ) | |
| | ) | |
| Claimant, | ) | No. 50 T 133 00325 03 |
| | ) | |
| v. | ) | David W. Plant, Esq., Arbitrator |
| | ) | |
| REMOTE SOLUTION CO., LTD., | ) | |
| | ) | |
| Respondent. | ) | |

**BRIEF OF REMOTE SOLUTION CO, LTD.**
**IN OPPOSITION TO CONTEC CORPORATION'S CLAIM FOR RELIEF**

David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766
Attorney for Remote Solution Co., Ltd.

Dated: March 17, 2005

## STATEMENT OF FACTS[1]

On February 16, 1999, Hango Electronics Co., Ltd., which subsequently changed its name to Remote Solution Co., Ltd. ("Remote Solution") entered into a Manufacturing and Purchase Agreement (the "Agreement") with Contec, L.P.[2] for the purchase and sale of remote control units ("RCUs"). (Park Decl. ¶2 & Ex. A[3]).  The Agreement was drafted by Contec, which set all the terms. (**Id.** ¶3).  This was Remote Solution's first major contract with a U.S. company, after prior smaller efforts to sell other unrelated products in the United States. (**Id.** ¶4).

Remote Solution did not have a lawyer review the Agreement, as it was not common practice in Korea to have lawyers review documents, because the low profit margins do not make it feasible. Entering into such a contract was unique to Remote Solution in any event.  Remote Solution had never had this type of manufacturing agreement with any other company with which it did business, operating instead pursuant to purchase orders with product specification sheets.  (**Id.**).

Section 1(a) of the Agreement states, in pertinent part, that "Purchase [Contec] will provide Seller [Remote Solution] with specifications (which may or may not include design parameters,

---

[1]    As Remote Solution understands it, this phase of the arbitration process is analogous to a motion for summary judgment by Contec Corporation. Remote Solution's obligation at this juncture is to present evidence showing that there is a factual dispute warranting an evidentiary hearing.  To that end, in this brief Remote Solution will (i) argue why, as a matter of law, the arbitrator must reject Contec Corporation's claim, and (ii) alternatively, demonstrate why there is a need for an evidentiary hearing (and discovery) before any award.  The inclusion of certain evidence at this stage is not intended to be comprehensive, and, if the Arbitrator schedules a hearing, Remote Solution reserves the right to introduce additional evidence.

[2]    Subsequently, Contec L.P. converted into Contec, LLC, a New York limited liability corporation, which subsequently merged into Contec Corporation, a Delaware corporation. Remote Solution refers to the entities herein interchangeably as "Contec."

[3]    The Declaration of Suk-Kyu Park is cited to herein as "Park Decl. ____."  The Declaration of David L. Finger is cited to herein as "Finger Decl. ____."

functionality, layout and overlay) with respect to RCU's to be designed, manufactured and sold pursuant to this Agreement. Seller will thereupon design an RCU in accordance with such specifications."

According to Section 3(a) of the Agreement, all RCU designs, specifications, overlays, functionality, layout, software codes and semiconductor chips were Contec L.P.'s "proprietary, confidential information and property...."

Section 3(c) states, in pertinent part, as follows:

> Seller shall defend any suit or proceeding brought against Purchaser to the extent that such suit or proceeding is based on a claim that the Products constitute an infringement of any valid United States or foreign patent, copyright, trade secret or other intellectual property right and Seller shall pay all damages and costs awarded by final judgment against Purchaser.

In Section 4(a) of the Agreement Remote Solution warranted that the RCUS would "conform to all Purchaser orders, specifications, design parameters and to Purchaser's Remote Control Design Requirements Document RD-001 Rev. A."

Section 13(a) of the Agreement states, in part, that:

> Each party shall indemnify and hold harmless the other party, its shareholders, directors, officers, employees, agents, designees and assignees, or any of them, from and against any and all losses, damages, liabilities, expenses costs, claims, suits, demands, actions, causes of actions, proceedings, judgments, assessments, deficiencies and charges (collectively, "Damages") caused by or relating to, or arising from a default in the performance by such party in accordance with this Agreement of its obligations hereunder, or a breach of its warranties or representations as made herein.

2

At the time the Agreement was entered into, Remote Solution was asked to supply only "dedicated" RCUs (*i.e.,* remote control units that operated only one device[4]). In March of 2000, Contec asked Remote Solution to manufacture "universal" RCUS, designed to operate several different appliances ("URCUs"). (**Id.** ¶¶5-6 & Exs. C, D, E).

In accordance with the Agreement, Contec provided samples and specifications to Remote Solution, with instructions to copy those samples and specifications, including specifications and instructions on the procedures and protocols for programming the URCUs. Remote Solution did not in any way design or participate in the designing of the specifications, procedures, protocols and/or codes for the URCUs. Remote Control took its instructions from Contec, and acted accordingly. (**Id.** ¶¶7-8 & Exs. F-L).

On or around November 15, 2000, Contec was sued by Universal Electronics, Inc. ("UEI") in the U.S. District Court for the Central District of California for patent infringement in connection with its RCUs. (1 Stein Decl. Ex. B). Shortly thereafter, the law firm of Heslin & Rothenberg, P.C. ("H&R") contacted David Ahn, an independent sales representative for Remote Solution, advising him that H&R represented Contec, that Contec had been sued by UEI, that H&R would soon begin negotiations, and that Remote Solution's "assistance in this matter is of utmost importance." (1 Stein Decl. Ex. C). Contec did not ask Remote Solution to assume the defense.[5] Remote Solution provided whatever assistance Contec requested. (**Id.** ¶10). Contec settled the litigation with UEI without any finding of infringement, and without prior notice to Remote Solution.

---

[4]
There has not been any suggestions that the dedicated RCUs infringed any patents.

[5]
At some point, Compo Micro Tech, Inc. ("CMT"), Contec's largest supplier, offered to assume the defense, but that offer apparently was rejected. (Park Decl. ¶9).

3

On January 4, 2002, Remote Solution and Contec executed a "General Agreement for the Trade," which provides, among other things, that "[a]ll the specifications are determined by Contec under which HanGo should manufacture the commodities under the approval for the specification." (**Id.** ¶3 & Ex. B).

In February, 2002, Philips Electronics North America Corporation and U.S. Philips Corporation (collectively "Philips") filed suit against Contec in the U.S. District Court for the District of Delaware, alleging infringement in connection with URCUs. (1 Stein Decl. Ex. A). After Contec provided Philips with a list of its suppliers, Philips amended its complaint to name them (Remote Solution, CMT and Seoby Electronics Co., Ltd. ("Seoby")) as additional defendants.[6] (Finger Decl. Ex. A).

H&R sent a letter to Remote Solution to inform it of this litigation. H&R again did not ask Remote Solution to assume control of the litigation. (Park Decl. ¶12). Instead, H&R asked Remote Solution to cooperate with Contec in responding to the lawsuit, and added that "[i]t may become necessary for [Remote Solution] to reimburse Contec for at least a portion of the expenses it is incurring because of this lawsuit." (1 Stein Decl. Ex. D).

In May, 2003, Contec settled the litigation with Philips. As part of the settlement agreement, Contec admitted to patent infringement. (1 Stein Ex. E at 4). Contec (and Seoby) also stipulated to

---

[6]

In both the *Philips* and *UEI* cases, the patents at issue related to the methods by which the URCUs were programmed to recognize and operate different appliances by different manufacturers. The patents did not relate to the design of the software or source codes utilized to implement those methods. (*See* Finger Decl. Ex. A).

4

the entry of a Consent Judgment and Order dated August 28, 2003, in which Contec and Seoby were found to have infringed Philips' patents. (Finger Decl. Ex. H).[7]

On March 29, 2004, the Court in the *Philips* case issued its decision on claim construction. **Philips Electronics North America Corp. v. Contec Corp.**, 312 F.Supp.2d 592 (D. Del. 2004). On April 6, 2004, the Court, having concluded that URCUs embody only one of the two patents asserted by Philips, entered summary judgment in favor of Philips and against CMT on one of the two patents at issue, and in favor of CMT and against Philips on the other of the two patents at issue. **Philips Electronics North America Corp. v. Contec Corp.**, 312 F.Supp.2d 642 (D. Del. 2004).[8] CMT went to trial in March, 2004, with the jury finding in favor of Philips and awarding damages of $1.00 per unit. **Philips Electronics North America Corp. v. Contec Corp.**, C.A. No. 02-123-KAJ, 2004 WL 1730362, Jordan, J. (D. Del. July 26, 2004).

The case against Remote Solution has not yet been scheduled for trial, pending additional discovery and pre-trial motions on certain defenses. **Philips Electronics North America Corp. v. Contec Corp.**, C.A. No. 02-123-KAJ, Jordan, J. (D. Del. Mar. 7, 2005).

---

[7]

At the same time, Philips settled with Seoby, the terms of which are unknown to Remote Solution. Also unknown is whether there was any settlement as between Seoby and Contec.

[8]

The Court severed the trial of CMT from the trial of Remote Solution.

## ARGUMENT

### I.  CONTEC IS NOT ENTITLED TO RECOVERY OF AMOUNTS PAID IN SETTLEMENT.

#### A.  THE AGREEMENT DOES NOT PROVIDE FOR REIMBURSEMENT OF SETTLEMENT PAYMENTS.

Contec seeks recovery of amounts paid to UEI and Philips in settlement. However, such amounts are not within the scope of Section 3(c) which states that "Seller shall pay all damages and costs awarded by *final judgment* against Purchaser." (Emphasis added).

Indemnification agreements are construed strictly, with any ambiguities resolved against the drafter (in this case, Contec). **Hooper Associates, Ltd. v. AGS Computers, Inc.,** 548 N.E.2d 903, 905 (N.Y. 1989); **Modern Settings, Inc. v. American District Telegraph Co.,** 503 N.Y.S.2d 44, 46 (N.Y.A.D. 1st Dept. 1986); **Quinones v. Waldbaum's Inc.,** 469 N.Y.S.2d 743, 744 (N.Y.A.D. 1st Dept.1983), *app. dismissed*, 62 N.Y.S.2d 646 (N.Y. 1984); **Grant Airmass Corp. v. Gaymar Industries, Inc.,** 645 F.Supp. 1507, 1515 (S.D.N.Y. 1986).

The express language of the Agreement speaks only of final judgments, not settlements. To award settlement amounts would be an improper re-writing of the Agreement.

#### B.  THE SETTLEMENT WITH PHILLIPS WAS NOT RELATED TO ANY ALLEGED INFRINGEMENT BY REMOTE SOLUTION.



6



**C.    CONTEC   HAS   NOT   ESTABLISHED   ENTITLEMENT   TO
INDEMNIFICATION FOR SETTLEMENT.**

Even assuming that the Arbitrator interprets the Agreement as entitling Contec to reimbursement for settlement payments, Contec has not established a factual basis for settlement. Under New York law, an indemnitee that fails to notify the indemnitor of a settlement may only recover from the indemnitor after establishing that (1) there was no defense to the claim, and (2) the amount of the settlement was reasonable. **National Union Fire Ins. Co. of Pittsburgh, PA v. Red Apple Group, Inc.,** 767 N.Y.S.2d 68, 69 (N.Y.A.D. 1st Dept. 2003).

Contec has offered nothing to satisfy these requirements as to either the *UEI* settlement or the *Philips* settlement, and is obligated to make an evidentiary showing.

7

## II.    CONTEC IS NOT ENTITLED TO INDEMNIFICATION FOR ITS OWN WRONGDOING.

The evidence demonstrates clearly that the specifications for the URCUs originated with Contec, not Remote Solution. (Park Decl. ¶¶5-7 & Exs. C-L). As such, Contec is seeking recovery of costs, including attorneys' fees, incurred as a result of its own actions which resulted in patent infringement. Remote Solution is the innocent victim.

Under New York York law[9], agreements indemnifying a party against its own wrongdoing are disfavored. **Eggeling v. Ryder Truck Rental, Inc.**, 677 N.Y.S.2d 845, 846 (N.Y.A.D. 4th Dept. 1998). Indemnification for certain types of wrongful conduct by the indemnitee is barred under New York law as a matter of public policy. Indemnification for other types of wrongful conduct by the indemnitee may be permitted under strict circumstances, *i.e.,* the language of the indemnity agreements must clearly express in unequivocal terms an intent to indemnify for such wrongful conduct. **Id.; Grant Airmass Corp.**, 645 F.Supp. at 1515.

Thus, to determine whether Contec is entitled to indemnification, including defense costs[10], the Arbitrator must determine (i) the scope of the indemnity provision, and (ii) whether Contec's conduct in engaging in patent infringement is within our outside the scope of the indemnity provision.

---

[9]

Pursuant to Section 25 of the Agreement, New York law governs the Agreement.

[10]

Where the indemnitor is not an insurance company, if there is no duty to indemnify, there is no duty to defend. **Brasch v. Yonkers Const. Co.**, 762 N.Y.S.2d 626, 629 (N.Y.A.D. 2nd Dept. 2003). In any event, Contec has framed its argument as a claim for indemnification for attorneys' fees under Section 13(a) for breach of the alleged duty to defend. Statement of Contec Corporation Regarding Its Basis for Relief at 3.

8

## A.    THE AGREEMENT DOES NOT INDEMNIFY CONTEC FOR ITS OWN NEGLIGENCE.

A contract of indemnity, even one between sophisticated parties[11], will not be deemed to indemnify a party for its own negligent acts unless the contract demonstrates an "unmistakable intent" to indemnify the negligent party. **Haynes v. Kleinewefers and Lembo Corp.**, 921 F.2d 453, 456-57 (2nd Cir. 1990) (rejecting suggestion that a lower standard applies); **Facilities Development Corp. v. Miletta**, 584 N.Y.S.2d 491, 494 (N.Y.A.D. 3rd Dept. 1992). *See also* **Heimbach v. Metropolitan Transportation Authority**, 553 N.E.2d 242, 246 (N.Y. 1990) (there must be contractual language evincing an "unmistakable intent" to indemnify the claim).

The Agreement states that "Seller shall defend any suit or proceeding brought against Purchaser to the extent that such suit or proceeding is based on a claim that the Products constitute an infringement of any valid United States or foreign patent, copyright, trade secret or other intellectual property right...." Consistent with the requirement of strict construction of indemnity agreements, the phrase "any suit" must be given a restrictive, rather than an expansive, interpretation. **Travelers Indemnity Co. v. AMR Services Corp.**, 921 F.Supp. 176, 186 (S.D.N.Y. 1996).

New York precedent amply demonstrates that the phrase "any suit" (as appears in Section 3(c) of the Agreement), not coupled with more expansive language such as "of every kind and character," "assuming all responsibility," or even "any and all suits," is not sufficiently clear and unequivocal to demonstrate an "unmistakable intent" to include claims based on an indemnitee's

---

[11]

Remote Solution's reference to "sophisticated parties" is not intended to suggest that it qualifies as a sophisticated party as that term is used in law. The Arbitrator must consider the cultural differences of a Korean business that never engaged in a substantial commercial transaction in the United States until the transaction at issue here.

9

own wrongdoing. *E.g., Sweeney v. Hertz Corp.*, 704 N.Y.S.2d 19, 21 (N.Y.A.D. 1st Dept. 2002) (contract providing that indemnitor "will indemnify and hold Hertz, its agents and employees harmless from and against any loss, liability and expense ...arising from the use or possession of the car by you or any operators with your, his or her permission," did "not clearly and unequivocally express an intent to indemnify Hertz against its own negligence"); **Eggeling**, 677 N.Y.S.2d at 846 (indemnity provision covering "any claim or cause of action 'arising out of or caused by the use of the Vehicle rented'," did "not clearly and unequivocally express an intent to indemnify Ruder against its own negligence"); **Facilities Development Corporation v. Miletta**, 584 N.Y.S.2d 491, 494 (N.Y.A.D. 3rd Dept. 1992) (indemnification "from suits, actions, damages and costs of every nature and description resulting from the work under this [c]ontract" did "not clearly connote an intent to provide for the indemnification of plaintiff's representative for damages caused by the representative's own tortious conduct and/or breach of contract"); **Quinones**, 469 N.Y.S.2d at 744 (agreement indemnifying against "all claims and demands for, or in connection with any accident, injury or damage whatsoever caused to any person or property arising, directly or indirectly, out of the business conducted by the Licensee" did not permit court to determine "with the requisite certainty that the licensing agreement was intended either to exculpate Waldbaum's from the consequences of its own negligence or to provide indemnity under the circumstances of this accident"); **Grant Airmass Corp.**, 645 F. Supp. at 1516 (where "[t]he Purchaser agrees to indemnify and save harmless Calspan and its employees against any and all claims for personal injury or property damage arising from the use of or related in any way to the test results or data delivered by Calspan pursuant to this contract," court holds that "[t]he indemnity provision here is not so broad

10

or inclusive, nor were negotiations of the provision so extensive, as to allow the Court to construe the provision to cover Calspan's own negligence").

Also instructive is **Baut v. Pethick Construction Co.**, 262 F.Supp. 350 (M.D. Pa. 1966), decided under Pennsylvania law (similar to New York indemnity law). The indemnification agreement provided that "[a]ll apparatus, appliance or materials must be furnished by the contractor under guarantee against claims for royalties or infringements of patents." **Id.** at 363. The Court concluded that this language did not permit indemnification for a party's own patent infringement. **Id.**

Under this line of authority, it is clear that Section 3(a) does not come close to expressing a clear and unequivocal intent to indemnify Contec against claims of patent infringement where, as here, the offending specifications were created or provided by Contec. Such a conclusion does not render the indemnification clause a nullity, as it continues to provide protection to Contec for harm not caused by it.[12]

---

[12]    To the extent that Contec relies on Section 13(a), such reliance is even more misguided for several reasons: (1) to the extent that Contec claims that Section 13(a) provides a duty to defend for patent infringement, it is superceded by the specific provisions of Section 3(c). **Muzak Corp. v. Hotel Taft Corp.**, 133 N.E.2d 688, 690 (N.Y. 1956); **Hernandez v. Wyeth-Ayerts Laboratories**, 727 N.Y.S.2d 591, 594 (N.Y. Sup. 2001), *aff'd in part, modified in part*, 738 N.Y.S.2d 336 (N.Y.A.D. 1st Dept. 2002);  (2) Section 13(a) is limited to indemnification arising from a breach of a contractual duty.  If Contec is stating that Remote Solution breached its contractual obligation by not defending, that begs the question as to whether Remote Solution had a duty to defend; (3) Remote Solution had no contractual duty to ensure that the specifications provided by Contec did not infringe any patents, and so did not default in any contractual obligation triggering Section 13(a); and (4) the phrase "default in the performance by such party" clearly indicates an intention to limit indemnification to harm caused by the indemnitor, not by the indemnitee.  To the extent that the language is deemed to be ambiguous as to the last part, such ambiguity is to be construed strictly against Contec as the drafter.

11

Any patent infringement resulted solely from the actions of Contec in supplying specifications and samples which purportedly infringed patents belonging to UEI and Philips. Remote Solution did not design the programming or software, but merely followed the instructions given to it by Contec.  As such, Contec is solely at fault for any infringement.  Given that the Agreement makes clear that Contec claims ownership rights to the specifications and that Remote Solution was obligated to abide by those specifications, there is no reason to conclude that the parties intended to have Remote Solution accept blind liability for specifications over which it had no control.[13]



---

[13]



### B.   CONTEC MAY NOT OBTAIN INDEMNIFICATION FOR ITS OWN INTENTIONAL, RECKLESS OR GROSSLY NEGLIGENT CONDUCT.

Even assuming, *arguendo*, that the Arbitrator interprets the language of Section 3(c) and/or 13(a) to permit indemnification of Contec's own negligence, that does not end the analysis. Instead, there is a question whether any misconduct by Contec rises to a higher level of wrongdoing.

Under New York law, indemnification for one's own intentional, reckless or grossly negligent conduct is barred as a matter of public policy. **Modern Settings, Inc.**, 503 N.Y.S.2d at 46.

Contec has admitted to and has had judgment entered against it for patent infringement. Thus, even assuming that the Arbitrator interprets the Agreement to permit indemnification for Contec's own negligence, to establish any right to indemnity or to a defense, Contec, as part of its affirmative case, must establish that its conduct was not grossly negligent, reckless or intentional.

Contec may not rely on the fact that it settled the case before there was an adjudication of liability (particularly since it has admitted liability and had judgment entered against it). In **Donaldson Lufkin & Jenrette Securities Corp. v. Star Technologies, Inc.**, 561 N.Y.S.2d 371 (N.Y. Supr. 1990), *aff'd*, 580 N.Y.S.2d 657 (N.Y.A.D. 1st Dept. 1992), a underwriter who settled a suit claiming federal securities violations sought to enforce an indemnity agreement. The Court stated that:

> Here, of course, we have neither a finding of fault nor of innocence. To grant plaintiffs' motion for summary judgment and enforce the indemnity clause would result in treating a settlor in the same manner as if it were found to be without fault. This I find would be violative of federal policy as the settlement may well have occurred where, as a result of discovery, the facts clearly showed that the settlor had violated the securities regulations. Although the law favors resolution of disputes, allowing a wrongdoer to obtain indemnity because he pays before a jury verdict rather than afterward

would not encourage the reasonable care required of underwriters under federal law.

**Id.** at 373-74.

While settlement is to be encouraged, to permit a party who settles to enforce an indemnity clause without having to show a lack of fault would also encourage settlements in unreasonable amounts, with the paying party comfortable that it could recover such unreasonable amounts from the indemnitor.

The facts of this particular case militate in favor of requiring Contec to show the absence of fault. Here, Contec has admitted to patent infringement. Thus, it starts with the presumption of fault or wrongdoing. That presumption is strengthened by the evidence that Contec was the source of the infringing specifications. As any right to indemnity is dependent upon a showing that Contec is free from fault, Contec should be required to prove that it was innocent.

As such, even if the Arbitrator determines that the Agreement permits indemnification of Contec's own negligence, then it must hold an evidentiary hearing to determine whether Contec's conduct rises to a higher level of culpability. Further, in order to prevent Contec from providing totally one-sided and selective evidence, and since all relevant information is in its control, the Arbitrator should permit discovery on this issue. *See* Commercial Arbitration Rule 21.

**III.    THE INDEMNITY PROVISION DOES NOT PROVIDE FOR RECOVERY OF AMOUNTS SPENT TO ENFORCE IT.**

Contec seeks recovery of costs it incurred in connection with federal and Korean judicial proceedings to enforce its claimed right to indemnity. Nothing in the Agreement permits recovery of such costs.

14

An indemnity provision is not to be interpreted as including attorneys' fees incurred in litigation between the parties (as opposed to claims by third parties) unless the intention of the parties to so provide is "unmistakably clear." **Hooper Associates, Ltd.,** 548 N.E.2d at 905-06 (rejecting argument that standard has been lowered).

Section 13(a) speaks in general terms of "all losses, damages, liabilities, expenses," etc., and refers to defending actions brought by third parties. This supports the conclusion that Section 13(a) was not intended to apply to attorneys' fees for actions between Contec and Remote Solution. *See* **Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,** 98 F.3d 13, 20-21 (2nd Cir. 1996) (indemnification against "any and all claims, demand or causes of action, any and all costs or expenses, including attorney fees..." was not an "unmistakably clear statement that [attorneys' fees incurred in actions between the parties to the contract] were intended").[14]

Further supporting this conclusion is Section 13(b)'s prohibition against "indirect, incidental, special or consequential damages arising out of or in connection with this agreement or based upon any breach of contract...." Attorney's fees arising from Contec's action to compel arbitration are a form of consequential or special damages, and so are barred.

## IV.   CONTEC'S DEMANDS ARE EXCESSIVE.

### A.   CONTEC SEEKS RECOVERY OF ATTORNEYS' FEES PAID FOR MATTERS UNRELATED TO REMOTE SOLUTION.

After Contec was sued in Delaware, it provided to Philips the names of its suppliers, Remote Solution, Seoby and CMT, all of whom were then added as defendants. (Finger Decl. Ex. A).

---

[14] Contec's cases to the contrary are inapposite as they all come from other jurisdictions and do not address controlling New York law.

If the Arbitrator determines that Contec is entitled to have Remote Solution reimburse its attorney's fees in connection with the *Philips* and *UEI* litigations, Contec must first exclude from those fees amounts not related to any conduct by Remote Solution. *See* **SS Amazonia**, 564 F.2d at 10 (causation is an essential ingredient for a claim for indemnification).

As noted previously, Remote Solution was not the only source of the infringing URCUs. The bills submitted by Contec include time spent on matters relating exclusively to other suppliers.[15] Many of the descriptions of activities in the time sheets are whited out, so no one other than Contec knows to what they refer. The burden is on Contec, which should be required to prove that each item on the timesheets relates to a matter referring either exclusively to the Products manufactured by Remote Solution, or to issues in common with the other defendants

## B.    THE ARBITRATOR SHOULD APPORTION ANY AWARD OF FEES.



There are reasons. First, Contec has not yet established that either lawsuit arose because the plaintiffs discovered infringement from a URCU manufactured by Remote Solution, as opposed to one of the other suppliers who manufactured the same URCUs. (Park Decl. ¶14). Thus it is unknown

---

[15]

    *See, e.g.,* 1 Stein Decl. Ex H, time entries for Nov.11/17/2000, 11/30/2000, 12/1/2000, 8/29-30/2001, 9/19/2001, 11/17/2000, 3/1/2002, 3/13-14/2002, 3/18-19/2002, 4/2-4/2002, 11/7/2002, 11/13/2002, 12/4-6/2002, 12/9/2002, 12/17/2002, 12/27/2002, 1/2/2003, 1/8/2003, 1/31/03, 2/21-22/03, 2/24/2003, 3/10/2003, 3/12-14/2003, 3/20/2003, 4/9-10/2003, 4/24/2003, 4/28/03, 4/24/2003, 5/19/2003, 5/22/2003, 7/1/2003, 7/3/2003, 7/7-11/2003.

16

whether the lawsuits were originally "based on a claim that the Products constitute an infringement

of any valid United States ... patent," as opposed to the plaintiffs subsequently learning in the course

of the litigation about Remote Solution's URCUs.



Pursuant to AAA Commercial Arbitration Rule 43(a), "[t]he arbitrator may grant any remedy

or relief that the arbitrator deems just and equitable and within the scope of the agreement of the

parties."  Contec should not be permitted to act oppressively against the smallest of its suppliers.

---

16



17

Contec's statement that "Remote Solution's refusal to indemnify Contec and settle this matter with Philips resulted in extending the length of the litigation" is both unsupported and illogical. Remote Solution's assuming the defense does not lead automatically to the conclusion that Remote Solution would have settled sooner.  Indeed, Remote Solution is still litigating the infringement action.

**C.    ALTERNATIVELY, BEFORE GOING ANY FURTHER THE ARBITRATOR SHOULD PERMIT REMOTE SOLUTION TO VOUCH IN ADDITIONAL PARTIES.**

"Vouching in" is a common law procedural device that allows a party (the "voucher") to join as a party to a proceeding (including an arbitration proceeding) a non-party (the "vouchee") that may be obligated to the voucher for some or all of a judgment. **Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S**, 333 F.3d 383, 386 (2nd Cir. 2003); **SCAC Transport (USA) Inc. v. S.S. "DANAOS"**, 845 F.2d 1157, 1161-62 (2nd Cir. 1988). This is done by notifying the non-party of; the pendency of the proceeding. Once notified, the non-party has the option of joining in the arbitration and defend. If the vouchee declines to do so, it runs the risk of being bound by the result in any subsequent litigation by principles analogous to collateral estoppel. **Duferco Int'l Steel Trading**, 333 F.3d at 386; **SCAC Transport (USA) Inc.**, 845 F.2d at 1162.

Remote Solution has a claim over for partial indemnification from Seoby and CMT. If Contec demands that the issue of the entire amount of fees and expenses be addressed in this proceeding, and the Arbitrator is no inclined to apportion costs, it is only fair, just and efficient that Remote Solution give Seoby, CMT and Ohsung notice and an opportunity to appear at any hearing.

**D.    THE FEES CHARGED BY CONTEC'S LAWYERS ARE UNREASONABLE.**

"In construing indemnity covenants ... it is everywhere recognized that the indemnitee must act in good faith. He cannot needlessly, in utter disregard of the burdens he is imposing on his indemnitor, incur attorney's fees, and in no case such as are excessive and unreasonable in amount." **Kilgore v. Union Indemnity Co.**, 132 So. 901, 902 (Ala. 1931).

There is evidence that Contec's fees are excessive and unreasonable:

18



2.    Contec obtained an award of attorney's fees from the U.S. District Court for the Northern District of New York in confirming the Arbitrator's interim award enjoining prosecution of litigation in Korea. Contec requested an award of $30,000.00. The Court vacated the award, calling the amount sought "grossly excessive." (Finger Decl. Ex. I).

Contec should be required to establish that its fees are justified.[18]  *See* **Milman v. Cataldi**, 529 N.Y.S.2d 449 (N.Y.C. Civ. Ct. 1988) (burden is on attorney to show that fee is reasonable).

## V.    ANY AWARD SHOULD BE REDUCED BY THE AMOUNT CONTEC OWES REMOTE SOLUTION.

Contec owes Remote Solution $692,512.27 for unpaid invoices. (Park Decl. ¶13 & Exs. M & N). Contec admits that it "withheld payment for those units as a setoff against the amounts owed by [Remote Solution] to Contec under its...indemnification obligations." (Arbitration Demand ¶23). As such, if the Arbitrator awards anything to Contec, the amount Contec owes Remote Solution should be set off against any award, with Contec being required to pay overage to Remote Solution..

---

[18]    Contec's request for fees in connection with this arbitration is premature, and is subject to the limitation in Section 19 of the Agreement that they may not exceed Remote Solution's attorney's fees.

19

## CONCLUSION

Contec's demands smack of overreaching. Contec is not revealing all of the relevant facts, and seeks to use the arbitration process to run roughshod over Remote Solution. Arbitration is supposed to be just as well as efficient. Justice requires a higher level of proof than Contec has provided to date.

In light of Contec's admission of wrongdoing, and the failure to include language in the Agreement permitting indemnification for Contec's own wrongdoing, Contec is not entitled to indemnification.

WHEREFORE, for the foregoing reasons, Remote Solution respectfully requests that the Arbitrator either (i) hold that Contec is not entitled to any award as a matter of law, or (ii) hold an evidentiary hearing, after full disclosure of evidence and inclusion of all affected parties, at which Contec must prove that it is free from fault and that the amounts it seeks are permitted under law and reasonable.

Respectfully submitted,

David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766
Attorney for Remote Solution Co., Ltd.

Dated: March 17, 2005

## CERTIFICATE OF SERVICE

I, David L. Finger, hereby certify that on this 17th day of March, 2005, I caused a copy of the

foregoing document to be served via Federal Express upon the below-listed counsel of record:

> Kenneth L. Stein, Esq.
> Jones Day
> 226 E. 41st St.
> New York, NY 10017

> David L. Finger (DE Bar ID #2556)
> Finger & Slanina, LLC
> One Commerce Center
> 1201 Orange Street, Suite 725
> Wilmington, DE 19801-1155
> (302) 884-6766