**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| CONTEC CORPORATION,<br>                          Claimant,<br><br>      v.<br><br>REMOTE SOLUTION CO., LTD.,<br>                        Respondent. | Arbitration No.<br><br>50 T 133 00325 03<br><br>David W. Plant, Esq. |

**CONTEC'S REPLY BRIEF IN SUPPORT OF ITS
STATEMENT REGARDING ITS BASES FOR RELIEF**

NYJD: 1569340.4

In the action before the Northern District of New York, Remote Solution argued that Section 3(c) of the 1999 Agreement "violates U.C.C. [Uniform Commercial Code] Section 2-312(c)," and thus "violates public policy," because it requires Remote Solution to indemnify Contec against patent infringement claims based on specifications provided by Contec. (Suppl. Stein Decl., Ex. N, p. 9, 1st full para.). U.C.C. Section 2-312(c) provides that:

> <u>Unless otherwise agreed</u> a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like <u>but a buyer who furnishes specifications to the seller must hold the seller harmless against any such claim which arises out of compliance with the specifications.</u>

Remote Solution dropped that argument after Contec pointed out that the parties had plainly "<u>otherwise agreed</u>" — in particular, Section 3(c) of the Agreement requires Remote Solution to indemnify Contec against <u>any</u> patent infringement claims directed at the "Products" manufactured under the Agreement and Section 1(a) defines "Products" as the remote control units designed by Remote Solution "in accordance with [the] specifications" provided by Contec. (Declaration of Suk-Kyu Park dated March 11, 2005 ("Park Decl."), Ex. A).

Remote Solution now argues that the parties cannot do precisely what the U.C.C. permits — agree to have a seller indemnify a buyer against patent infringement claims that arise out of compliance with the buyer's specifications. According to Remote Solution, providing such specifications constitutes negligence and would accordingly be unenforceable because a buyer cannot indemnify itself against its own negligence. Remote Solution's argument directly contradicts the U.C.C. and no court has ever applied it in releasing a seller from a contractual duty to indemnify a buyer against patent infringement claims. Remote Solution is simply attempting to re-write the agreement to escape its indemnification obligations. That is improper and must fail.[1]

---

[1] Moreover, there is nothing unusual or unfair about the indemnification provision. While Remote Solution attempts to portray itself as a naïve foreign company, it has been in the business of designing and manufacturing remote control units since 1994 and, prior to any business relationship with Contec, had 110 employees and close to $8.7M in sales. (Suppl. Stein Decl., Ex. P, p. 1). In 1998, its president, Hong Bum Shin, was reported by D&B as having "managerial competence and extensive knowledge in this business [the manufacturing of remote controls] based on his 8 year

1

Remote Solution also argues that Contec has not proven that it was "innocent" of any "intentional, reckless or grossly negligent conduct" that would bar indemnification "as a matter of public policy," apparently referring to the allegation of "willful patent infringement" in Philips' Amended Complaint. (*See* Opp., 13; Suppl. Stein Decl., Ex. N, pp. 9-10). It further argues that an evidentiary hearing is therefore required to "determine whether Contec's conduct rises to a higher level of culpability." (Opp., 14). There is however not a scintilla of evidence that would support a claim of willful infringement against Contec. Certainly, Remote Solution has identified none. In fact, as Remote Solution well knows, Contec retained counsel after learning of Philips' claims and contacted Remote Solution to request information from Remote Solution in order to evaluate the merits of those claims. In other words, Contec behaved as a responsible company would. Philips allegations of willful infringement, a common allegation in complaints for patent infringement, were unfounded and dropped in the settlement. A hearing into willfulness at this stage would be nothing more than an expensive sideshow.

Remote Solution's other arguments are equally without merit and are addressed below.

I. **The Indemnification Provision is Valid and Expressly Permitted by the U.C.C.**

Remote Solution asserts that it is not required to indemnify Contec against Philips' and UEI's patent infringement claims, despite the plain language of Section 3(c) of the Agreement requiring it to do so, because Contec was negligent in providing specifications for the remote controls and an indemnity agreement "will not be deemed to indemnify a party for its own negligent

---

experience at Hae Pyung Electronic Co., Ltd., which was involved in similar business line." (*Id.*, p. 5). Both it and Hango Electronics, Inc. (its local U.S. corporation) advertised Remote Solution's numerous remote control units, including universal remote control units, and their ability to develop "custom" and "semi-custom" models. (*See* Suppl. Stein Decl. Exs. Q and R; Park Decl., Ex. A, last page). Further, in 1997, Remote Solution actively sought to "expand its RCU [remote control unit] sales by entering the United States consumer market," and its "business plan was to sell as many RCUs as possible." (Suppl. Stein Decl., Ex. S, pp. 3-4). The truth then is that Remote Solution was a sophisticated manufacturer of remote control units that actively sought out the U.S. market for sales of custom and semi-custom models, such as those it sold to Contec. Certainly, businesses in these circumstances can agree to allocate the risk of patent infringement suits as they see fit. (Suppl. Stein Decl., Ex. T, p. 3 (Remote Solution stating that "[t]he fact that Remote Solution entered into a contract with Contec, L.P. is hardly evidence of anything other than an arms-length commercial relationship.")).

acts unless the contract demonstrates an 'unmistakable intent' to indemnify the negligent party." (Opp. 9). In so doing, Remote Solution negates a provision of the U.C.C. by applying a theory that has no applicability to indemnification against patent infringement. Moreover, even if the doctrine applied, Remote Solution would still be required to indemnify Contec, because that was the unmistakable intent of the parties as set forth in the Agreement.

Section 2-312(c) of the U.C.C. (N.Y. U.C.C. § 2-312(3)), set forth above, expressly provides that a buyer and seller of goods may agree to override the implied warranty against patent infringement and its provision that "a buyer who furnishes specifications to the seller must hold the seller harmless against any ... claim [of infringement] which arises out of compliance with the specification." Courts have consistently recognized the power of parties to reach such agreements.[2] There can be no argument that Contec and Remote Solution had so agreed — again, Remote Solution had agreed, in Section 3(c) of the Agreement, to defend "any suit or proceeding" based on a claim that "the Products" constitute an infringement of a patent, and Section 1(a) defines "Products" as the remote control units designed by Remote Solution in accordance with specifications provided by Contec.[3] In view of this plain language, Remote Solution cannot now escape its indemnification obligations — to permit it would be contrary to the intent and expectations of the parties and contrary to the case law and U.C.C. provisions holding that parties are entitled to vary the implied warranty against infringement.

Moreover, the legal doctrine cited by Remote Solution has no application to a patent infringement claim. In each and every case cited by Remote Solution, the issue was whether the

---

[2] *See, e.g., Park-Ohio Indus., Inc. v. Tucker Induction Sys., Ltd.*, 1988 WL 1045372, at *1-2 (E.D. Mich. 1987) (holding that parties had "otherwise agreed" for seller to indemnify buyer for any patent infringements, including those that "may arise out of compliance with specifications furnished by Buyer."); *Landis and Staefa (UK) Ltd. v. Flair Int'l Corp.*, 60 F. Supp. 2d 14, 22-23 (E.D.N.Y. 1999); *MAS Corp. v. Thompson*, 302 S.E.2d 271, 275 (N.C. Ct. App. 1983); *see also* U.C.C. § 1-102(3) ("The effect of provisions of this Title may be varied by agreement."); U.C.C. § 2-317(c) ("Express warranties displace inconsistent implied warranties.").

[3] *See Parks-Ohio Indus.*, 1988 WL at *2 ("The U.C.C. Hold Harmless Warranty provides that a warranty against infringement by the buyer to the seller will be implied 'unless otherwise agreed': the statute does not require the recitation of any particular disclaimer."); *Landis and Staefa*, 60 F. Supp. 2d at 23 (holding that a general disclaimer of implied warranties under UCC § 2-316 is sufficient to disclaim the implied warranty against infringement).

NYJD: 1569340.4

indemnification clause was intended to cover a particular <u>negligence</u>-based claim. Patent infringement however is not a negligence-based claim. To establish infringement, the patent owner must demonstrate that an accused device meets each and every limitation of a claim — whether the designer of the product was in some way "negligent" or not is irrelevant. Not a single case has held a provision for indemnification against patent infringement unenforceable due to the indemnitee's alleged negligence.

Moreover, Remote Solution's claim is, in essence, that Contec was negligent by failing to determine whether the specifications it provided to Remote Solution might give rise to any third party patent infringement claims. Contec, however, was under no legal duty to make such a determination, and Remote Solution has cited no authority for imposing such a duty on Contec.[4]

In any event, even if the doctrine applied, it is not meant to, and does not, override the unmistakable intent of the parties. As Remote Solution concedes, a contract of indemnity will indemnify a party for its own negligent acts if the contract demonstrates an "unmistakable intent" to indemnify the negligent party. (Opp. 9). Here, the Agreement plainly evinces such an unmistakable intent — *i.e.*, that Remote Solution would indemnify Contec against patent infringement claims, such as those by Philips and UEI, relating to the products made by Remote Solution under the Agreement. That is what the parties agreed to. Indeed, Remote Solution has

---

[4] Furthermore, Remote Solution's repeated assertions that Contec is to blame for Philips' infringement allegations are ridiculous in view of the fact that Remote Solution was itself offering for sale, before any relationship with Contec, products, such as its model AB100, having identical or similar set-up procedures to those Philips accused of infringement. (Suppl. Stein Decl., Ex. X, pp. 6-8). In other words, Philips would have made exactly the same infringement allegations if Contec had bought one of Remote Solution's standard models, instead of a custom one.

[4] *See, e.g., Park-Ohio Indus., Inc. v. Tucker Induction Sys., Ltd.*, 1988 WL 1045372, at *1-2 (E.D. Mich. 1987) (holding that parties had "otherwise agreed" for seller to indemnify buyer for any patent infringements, including those that "may arise out of compliance with specifications furnished by Buyer."); *Landis and Staefa (UK) Ltd. v. Flair Int'l Corp.*, 60 F. Supp. 2d 14, 22-23 (E.D.N.Y. 1999); *MAS Corp. v. Thompson*, 302 S.E.2d 271, 275 (N.C. Ct. App. 1983); *see also* U.C.C. § 1-102(3) ("The effect of provisions of this Title may be varied by agreement."); U.C.C. § 2-317(c) ("Express warranties displace inconsistent implied warranties.").

never offered any alternative interpretation of the indemnification provision.[5] That Remote Solution is now unhappy with the bargain it struck does not permit it, or the Arbitrator, to rewrite the plain terms of the Agreement.[6] The Agreement must be enforced as written.[7]

Remote Solution asserts that releasing it from its indemnity obligations against infringement claims based on specifications provided by Contec "does not render the indemnification clause a nullity, as it continues to provide protection to Contec for harm not caused by it." (Opp., 11). In fact it renders the clause completely ambiguous and would give rise to a dispute every time Contec would seek to enforce it. For example, in the Philips case, Remote Solution had taken the position that the claims of one of the two patents at issue required that data be stored in a particular way, which was independent of any specifications provided by Contec (*i.e.*, the manner in which data is stored was entirely Remote Solution's design choice).[8] (Suppl. Stein Decl., Ex. O, p. 10, last full para.). Yet even in that case Remote Solution apparently denies any indemnity obligation.

---

[5] *See Kitrosser v. CIT Group/Factoring Inc.*, 1995 WL 567115, at *6 (S.D.N.Y. 1995) ("Where a contract is unambiguous, the Court must enforce it by its terms, and plaintiffs do not assert that this provision is subject to any alternative interpretation.") (internal citation omitted).

[6] *See, e.g., Guasteferro v. Family Health Network*, 203 A.D.2d 905, 612 N.Y.S.2d 720, 721 (App. Div. 1994) ("Where the terms of a contract are unambiguous, the court must enforce the language as written and not make a new contract for the parties under the guise of interpreting the writing.") (internal quotation marks and citations omitted); *United States v. Herman*, 2005 WL 66894, at *5 (S.D.N.Y. 2005) ("A Court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings.") (internal quotation marks and citations omitted); *see also City of Orange Township v. Empire Mortgage Servs., Inc.*, 775 A.2d 174, 179 (N.J. Super. Ct. App. Div. 2001) ("Nor may the courts remake a better contract for the parties than they themselves have seen fit to enter into, or to alter it for the benefit of one party and to the detriment of the other.") (internal quotation marks and citations omitted).

[7] Remote Solution asserts that "the phrase 'any suit' (as appears in Section 3(c) of the Agreement), not coupled with more expansive language such as 'of every kind and character,' 'assuming all responsibility,' or even 'any and all suits,' is not sufficiently clear and unequivocal to demonstrate an 'unmistakable intent' to include claims based on an indemnitee's own wrongdoing." (Opp., 9-10). There is however nothing unclear or equivocal about that provision — it encompasses "any suit or proceeding brought against Purchaser [Contec] to the extent that such suit or proceeding is based on a claim that the Products constitute an infringement of any valid United States or foreign patent . . . ." (Park Decl., Ex. A, Section 3(c)). *See Auto Caravan Corp. v. Ins. Co. of N. Am.*, 1988 WL 74999 at *2-3 (S.D.N.Y. Jul. 8, 1988) (the "language is not susceptible of at least two fairly reasonable meanings. Instead plaintiff has merely offered its own 'fanciful' interpretations.") (internal quotation marks and citations omitted). We completely fail to see how adding any of the language proposed by Remote Solution would make that clause any clearer than it is.

[8] Contrary to Remote Solution's assertion at Opp., p. 12, Remote Solution, not Contec, designed the software in the remote control units.

- 5 -

II.   **Remote Solution's Assertion that the Infringement Allegations were the Result of Contec's "Own Intentional, Reckless or Grossly Negligent Conduct" is Baseless.**



Although Remote Solution does not say here what specific conduct it believes Contec may have engaged in, it based a similar argument in the district court on Philips' allegation of "willful patent infringement." (Suppl. Stein Decl., Ex. N, pp. 9-10). Philips dropped those allegations as part of its settlement with Contec, but, in any event, Remote Solution well knows those allegations had no merit. Contec promptly retained patent counsel after learning of Philips' claims and contacted Remote Solution, seeking information pertaining to its universal remote control units and to prior art. (See Stein Decl., Ex. C, p. 2). In other words, Remote Solution knows that Contec acted prudently in response to Philips' infringement allegations.[10]   Tellingly, Remote Solution continued to manufacture universal remote control units of the type Philips accused of infringement for both Contec and other customers, such as TIVO, Harman Kardon and Hy-Tek, so presumably it too must believe there is no basis for Philips' willful infringement allegations. (*See* Suppl. Stein

---

[10] *See Hall v. Aqua Queen Mfg. Inc.*, 93 F.3d 1548, 1555 (Fed. Cir. 1996) (test of willful infringement is "whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed.").

NYJD: 1569340.4

Decl., Ex. S, pp. 4, 5-6). Remote Solution's request for, in essence, a mini-trial on willful infringement is simply a delay tactic and should be refused. In fact, a finding of willful infringement against Contec would require the same finding against Remote Solution, since the charge relates to remote control units Remote Solution manufactured after it knew of Philips' patents — a result that we do not believe Remote Solution is seriously pursuing.

### III.  Remote Solution's Arguments That Contec Is Not Entitled To The Full Amount It Seeks In Damages Are All Without Merit.

#### A.  Contec is Entitled to Reimbursements of its Settlement Payments.

Remote Solution asserts that the "express language [of Section 3(c)] of the Agreement speaks only of final judgments, not settlements," and "[t]o award settlement amounts would be an improper re-writing of the Agreement." (Opp., 6). Remote Solution is wrong for three reasons. *First*, Section 13(a) of the Agreement expressly provides for reimbursement of settlement amounts under the present circumstances:

> If the Indemnifying Party within a reasonable time after notice of a claim fails to defend the Indemnified Party, the Indemnified Party shall be entitled to undertake the defense, compromise <u>or settlement</u> of such claim at the expense of the Indemnifying Party.

(Park Decl., Ex. A, p. 8, Section 13(a)). Thus, when Remote Solution (the indemnifying party), after receiving notice of Philips' and UEI's claims, failed to defend Contec (the indemnified party), Contec was entitled to settle the claims at Remote Solution's expense.[11] *Second*, even if the Agreement did not contain Section 13(a), under well-established case law, Contec would still have been entitled to settle these claims at Remote Solution's expense.[12] *Third*, in both the Philips and

---

[11] Remote Solution's passing statement that Contec "did not ask Remote Solution to assume the defense" (Opp. at 3, 4) is without merit. The purpose of Contec's letters to Remote Solution regarding Philips' and UEI's claims was clear — to notify Remote Solution of the claims for indemnification purposes. *See Combustion Eng'g v. Imetal*, 235 F. Supp. 2d 265, 274 (S.D.N.Y. 2003) ("While the 1990 Letter does not demand indemnification in so many words, it is clear that the purpose of the letter was to notify CE about the claim for indemnification purposes.").

[12] *See, e.g., Combustion Eng'g v. Imetal*, 235 F. Supp. 2d 265, 275 (S.D.N.Y. 2003) ("[I]t is well settled New York law that upon receiving notice of a claim or proceeding brought against an indemnitee, an indemnitor who fails to assume responsibility for that claim and declines to defend the action is conclusively bound by <u>any reasonable good faith settlement</u> the indemnitee may make or any litigated judgment that may be rendered."); *Feuer v. Menkes Feuer, Inc.*, 187 N.Y.S.2d 116, 121 (App. Div. 1959) (same) (citations omitted); *Goldmark Indus., Ltd. v. Tessoriere*, 681 N.Y.S.2d

- 7 -

UEI cases, final judgments dismissing the cases were in fact entered. Contrary to Remote Solution's assertion, there are no ambiguities in the Agreement or the law on this point.[13]

### B. Contec's Settlement with Philips Was Related to Alleged Infringement by Remote Solution.

Remote Solution asserts that "[t]he settlement agreement with Philips expressly states that the settlement payment is exclusively for damages causes [sic] by URCUs manufactured for Contec by Seoby." (Opp., 6). The agreement says no such thing.



---

327, 328 (App. Div. 1998) ("When an indemnitor has notice of the claim against it, the general rule is that the indemnitor will be bound by <u>any reasonable good faith settlement</u> the indemnitee might thereafter make.").





### C. Contec is Entitled to Recover the Amounts it has Spent Enforcing the Indemnity Provision.

Remote Solution asserts that "[n]othing in the Agreement permits recovery" of "costs [Contec] incurred in connection with federal and Korean judicial proceedings to enforce its claimed right to indemnity." (Opp., 14). Remote Solution is wrong. As Contec explained on pages 3-4 of its Statement, Contec's right to those fees flow from Section 19 of the Agreement, which provides for an award of attorneys' fees to the prevailing party in the arbitration, and cases holding that costs incurred in court actions tied to and in aid of arbitration are chargeable expenses under such provisions. Remote Solution simply ignores Section 19 and the case law cited by Contec, focusing

- 9 -

NYJD: 1569340.4

instead on Section 13 of the Agreement. Contec however never based its claim for fees in connection with the federal and Korean proceeding on that section.

An award of attorneys' fees incurred in connection with those proceedings is especially appropriate here since Exhibit B to the Declaration of Suk-Kyu Park, submitted with Remote Solution's Opposition Brief, demonstrates that the arguments Remote Solution made before the Northern District of New York, the Second Circuit Court of Appeals, and the Arbitrator were a sham. Remote Solution's entire basis for objecting to the jurisdiction of the Arbitrator and seeking to enjoin the arbitration was that Contec Corporation, as a non-signatory to the 1999 Manufacturing and Purchase Agreement, could not enforce that agreement, including its arbitration provision against Remote Solution. However, Exhibit B to Mr. Park's declaration, an agreement entitled "General Agreement for the Trade," expressly acknowledges that the 1999 Manufacturing Agreement governs the business dealings between the two companies:

> This Agreement shall be governed by agreement by both parties. This agreement does not supersede or invalidate the Manufacturing Agreement dated February 16, 1999. Should conflicts between the two documents arise, the Manufacturing Agreement will govern.

That agreement is signed by both Contec Corporation and Remote Solution. In view of it, Remote Solution had no reasonable basis for disputing that the Arbitrator had the authority to decide whether Contec Corporation could enforce the 1999 Agreement, no reasonable basis for filing its Korean action, no reasonable basis for asserting that Contec Corporation could not in fact enforce the Agreement, and no reasonable basis for asking the Arbitrator, the District Court and the Court of Appeals to stay the arbitration. An award of attorneys' fees to Contec is thus particularly appropriate here.

NYJD: 1569340.4

### D. Contec Should Not be Required to Parse Out De Minimus Amounts of Work Incurred in Connection with the Philips and UEI Matters that Were Directed to Specific Suppliers Other than Remote Solution.

Remote Solution asserts that "Contec must ... exclude from [its request for attorneys' fees] amounts not related to any conduct by Remote Solution. (Opp., 16). But where, as here, there is a great commonality of issues between the units supplied by Remote Solution and those supplied by Contec's other suppliers, Contec should not be required to parse its fees to exclude specific suppliers. Indeed, such parsing would be extremely difficult, if not impossible, as the work directed to specific suppliers is often relevant to all the suppliers.



Remote Solution also complains that "[m]any of the descriptions of activities in the time sheets are whited out." (Opp, p. 16). But Contec did so only to protect attorney-client privileged information, as is its right.[16] If there are particular entries that are of concern to Remote Solution, Contec would propose that the original unredacted entries be submitted to the Arbitrator for *in camera* inspection.

Remote Solution further asserts that "[t]he burden is on Contec ... to prove that each item on the timesheets relates to a matter referring either exclusively to the Products manufactured by Remote Solution, or to issues common with the other defendants." (Opp., 16). Again however, Contec is not required to parse their bills in that manner. In any event, Contec has produced its actual bills and Remote Solution cannot stand on blanket objections to them. If it has any particular objections, it needed to state them. *See Coleman v. J.R.'s Tavern, Inc.*, 622 N.Y.S.2d 334, 336

---

[16] *See, e.g., Chicago Ins. Co. v. Abstract & Title Guaranty Co.*, 2004 WL 692051, at *4 (S.D. Ind. 2004); *Meduna v. Holder*, 2003 WL 124214, at *3 (Tex. App. 2003); *see also* N.D. Ill. Local Rule 54-3(d)(1) ("These [billing] records may be redacted to prevent disclosure of material protected by the attorney-client privilege or work product doctrine.").

NYJD: 1569340.4

(App. Div. 1995); *Gray Mfg. Co. v. Pathe Indus., Inc.*, 305 N.Y.S.2d 794, 796-97 (App. Div. 1969), *aff'd*, 312 N.Y.S.2d 300 (1970).

### E. The Arbitrator Should Not Apportion the Attorney Fees.



Significantly, Remote Solution does not dispute the basis for Contec's argument that Remote Solution should be responsible for <u>all</u> of Contec's attorneys' fees in the Philips and UEI cases — namely, that had Remote Solution defended Contec as it was obligated to do, Contec would have incurred little or no attorneys' fees or expenses. (Statement, p. 5, n.12). Nor could it, because that is exactly what Remote Solution itself has done in the Philips litigation. It largely relied on co-defendant CMT's defenses in order to keep its own expenses at a minimum.[18]



---

[18] *See* Suppl. Stein Decl., Ex. U, pp. 2-3 (Remote Solution stating that it "is and has been relying on the defenses set forth by CMT (and has joined in on those defenses in connection with the defendants' motions for summary

- 12 -

NYJD: 1569340.4

### F. Remote Solution Should Not Be Permitted to "Vouch In" Additional Parties.

Remote Solution asserts that it should be permitted to "vouch in" Seoby and CMT because it "has a claim for partial indemnification" against them. (Opp. 18). Plainly, however Remote Solution does not have an indemnification claim against those companies, which is the only situation in which that procedure may be invoked. In other words, one may only vouch in potential indemnitors. *See Farrell Lines, Inc. v. Nalfleet, Bull & Roberts, Inc.*, 1995 WL 42259, at *1, 3 (S.D.N.Y. 1995) (citing N.Y. U.C.C. Law § 2-607(5) (1993)). There is simply no relationship between Remote Solution and Seoby or CMT that would give rise to an indemnification obligation. At most, what Remote Solution describes is a claim for contribution for damages that Remote Solution may be required to pay to Contec. The "vouching in" procedure may not however be used for such claims. *See United Arab Republic of Egypt v. Lee*, 1997 WL 403478, at *6, n. 2 (S.D.N.Y. 1997).

### G. The Fees Charged by Contec's Lawyers are Reasonable.



---

judgment."); Ex. V, p. 11, n.4 (Remote Solution arguing that "[i]t is entirely rational for a defendant with limited resources, when joined with a defendant with greater resources, not to engage in costly duplicative efforts, especially where such duplication affords no additional or greater prospect of victory as to those specific defenses. While Defendant can be faulted for not anticipating CMT's motion to sever, no defendant should be criticized for not spending every last cent to litigate a case, especially when it appears that there is a cost-effective alternative.).

As to (1), the fees reflect the difficulty in responding to Remote Solution's arguments, which more often than not come completely out of left field and have no basis in law or fact. In the case of Hango's motion to add a cross-claim, Hango (represented by Remote Solution's counsel) asserted that Contec had an obligation to indemnify it, even though Hango disclaimed any relationship at all between it and Contec, much less one that would give rise to an indemnification obligation. It was not until its reply brief that Hango first identified the supposed legal basis for its claim. The motion was however simply an improper attempt by Remote Solution to use its U.S. subsidiary to do an end-run around the arbitration provisions of the Agreement and drag Contec back into the Delaware action. It was certainly reasonable for Contec to devote the resources necessary to prevent that from happening. Remote Solution claims to have incurred only $3,330 in legal fees in connection with that motion, though it does not provide any time records for the work or give the hourly rates of the attorneys involved in it. That amount would account for less than 15 hours of time for a mid-level associate at Pennie & Edmonds at the time (one having a rate of, e.g., $230/hr.) — it has no bearing whatsoever on what a reasonable amount of fees would be for defending against Hango's motion.



- 14 -

NYJD: 1569340.4


Case 1:06-cv-00004-SLR    Document 12-12    Filed 03/01/2006    Page 16 of 17



Remote Solution claims that "Contec should be required to establish that its fees are justified." (Opp., 19). However, Contec has submitted to Remote Solution its actual bills, which on their face are reasonable. Remote Solution cannot now stand on generalized accusations that the fees requested are unreasonable. If it has objections, it must specifically identify them. *See Coleman*, 622 N.Y.S.2d at 336; *Gray*, 305 N.Y.S.2d at 796-97.

### H.   An Award to Contec Should Not be Reduced by Amounts for Products that were not Delivered to It.

Remote Solution asserts that any award to Contec should be reduced by "$692,512.57 for unpaid invoices." (Opp., 19). Contec agrees that any set-off held by it should be deducted from the amount of damages awarded against Remote, but that amount is $620,038, not $692,512.57. Remote Solution has included in its total $72,474.27 for products never delivered to Contec. (*See* Park Decl., Ex. N). Contec was not holding that sum as a set-off and it should not be used to reduce Contec's award.

In view of the foregoing, Contec believes that it is entitled to the entire amount of damages sought in its Statement, reduced by its $620,038 set-off. Further, Remote Solution has not raised any issues that would require an evidentiary hearing. Certainly one is not required for the arbitrator to decide the reasonableness of Contec's damages, as Courts routinely decide such issues without a hearing. If the Arbitrator however agrees that an evidentiary hearing is required, Contec proposes that a conference first be held to decide which issues require an evidentiary hearing for resolution and to limit the scope of such a hearing and any attendant discovery.

---

[19] The District Court vacated the award because Contec inadvertently missed the filing date for its verified statement, not because the Court found the fees excessive.

NYJD: 1569340.4

Respectfully submitted,

Dated: March 25, 2005          By: _____
Kenneth L. Stein
Richard H. An
JONES DAY
226 East 41st Street
New York, N.Y. 10017
(212) 790-9090

Attorneys for Claimant
Contec Corporation

- 16 -

NYJD: 1569340.4