ATTORNEYS' EYES ONLY

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| CONTEC CORPORATION,<br><br>                   Claimant,<br><br>       v.<br><br>REMOTE SOLUTION CO., LTD.,<br>                  Respondent. | Arbitration No.<br><br>50 T 133 00325 03<br><br>David W. Plant, Esq. |

**JOINT STATEMENT REGARDING CONTEC'S
CLAIM TO INDEMNIFICATION
FROM REMOTE SOLUTION**

ATTORNEYS' EYES ONLY

Contec and Remote Solution jointly submit this statement pursuant to the Arbitrator's email of April 29, 2005, accepting the parties' proposal that the Arbitrator first decide the issue of Contec's entitlement to indemnification, before addressing the issue of damages. The purpose of this submission is to enable the Arbitrator to determine whether he can decide the issue of Contec's entitlement to indemnification based on the undisputed facts set forth below, or, if not, to identify disputed issues that must first be resolved and to obtain the parties' proposals on resolving them. Contec does not believe that there are any disputed facts that bear on its claim for indemnification.

Section I below lists undisputed and disputed facts. Where a fact is disputed, the party proposing the fact is identified and the other party's objections to the proposed fact is provided thereafter. The parties have not generally included all materiality objections — that should not be taken to mean that the parties have none or that the parties agree that all the listed facts are material. That determination is left to the Arbitrator.

Section II provides a summary of each party's arguments relating to Contec's entitlement to indemnification from Remote Solution. Section II.A provides a summary of Contec's arguments and Section II.B provides a summary of Remote Solution's arguments.

## I.    Undisputed and Disputed Facts

1. In 1996, Contec Corporation (then Contec, L.P.)[1] began selling universal remote control units ("URCs") that allowed end-users to control different appliances from different manufacturers. The universal remote control units included at least one of two methods for programming the remote control to work with a particular appliance — a search method and a direct code entry method. In the search method, referred to as "Point and Press" or "Auto

---

[1] Contec L.P., Contec LLC, and Contec Corporation are collectively referred to herein as "Contec."

**ATTORNEYS' EYES ONLY**

Scan," the end-user is required to point the URC at a device and hold down a key or series of keys. The URC would then send out a series of signals, going through its stored library of codes, until the appliance recognized the signal and responded, at which time that code would be stored for future use. In the direct code entry method, the user was required to input a three-digit code associated with a given device from a given manufacturer (a list of device codes for each manufacturer was included with the instructions), so that the remote control device recognized that manufacturer's device. Universal remote control devices including one or both of these programming methods are referred to herein as URCs.



5. On February 16, 1999, Contec L.P. and Hango Electronics Co., Ltd. ("Hango") entered into a Manufacturing and Purchase Agreement ("1999 Agreement"), setting forth the terms under which Contec L.P. would purchase remote control devices manufactured by Hango. (Park Decl., Ex. A).

**ATTORNEYS' EYES ONLY**

6.   Subsequent to February 16, 1999, Hango changed its name to Remote Solution Co., Ltd.

(Hango and Remote Solution are referred to herein as "Remote Solution").

7.   On August 18, 1999, Contec L.P. was converted to Contec LLC, a New York limited liability

corporation.  On January 1, 2001, Contec LLC merged into Contec Corporation, a Delaware

Corporation.

8.   Section 1(a) of the 1999 Agreement provides that

> Purchaser will provide Seller with specifications (which may or may not include
> design parameters, functionality, layout and overlay) with respect to the RCU's
> [remote control units] to be designed, manufactured and sold pursuant to this
> Agreement.  Seller will thereupon design an RCU in accordance with such
> specifications.  (RCU's designed and/or manufactured and sold by Seller to
> Purchaser pursuant to this Agreement are referred to herein as "Products").

9.   Section 3(a) of the 1999 Agreement provides that

> All of the following items, if supplied by Purchaser to Seller are considered
> Purchaser's proprietary, confidential information or if developed by Seller in
> connection with its performance of its obligations pursuant to this Agreement are
> considered work for hire on behalf of Purchaser and shall be and are the
> Purchaser's proprietary, confidential information and property:
>
> (i)     RCU designs (including conceptual designs), specifications,
>          overlays, functionality and layout;
> (ii)    Plastic case designs;
> (iii)   Software code; and
> (iv)   Semiconductor-chips
>
> (All of the foregoing is referred to as "Proprietary Information").
> Seller shall and hereby does assign to Purchaser all of its rights in and to the
> Proprietary Information.  Seller agrees to perform all reasonable acts and execute
> all necessary or appropriate documents and otherwise provide assistance so as to
> vest title to the Proprietary Information in Purchaser and so as to enable Purchaser
> to obtain for itself or its nominees patents, copyrights and other legal protection
> for the Proprietary Information.

10. Section 3(c) of the 1999 Agreement provides that

> Seller shall defend any suit or proceeding brought against Purchaser to the extent
> that such suit or proceeding is based on a claim that the Products constitute an
> infringement of any valid United States or foreign patent, copyright, trade secret
> or other intellectual property right and Seller shall pay all damages and costs
> awarded by final judgment against Purchaser.

**ATTORNEYS' EYES ONLY**

11. Section 13(a) of the 1999 Agreement provides that

> Each party shall indemnify and hold harmless the other party, its shareholders, directors, officers, employees, agents, designees and assignees, or any of them, from and against all losses, damages, liabilities, expenses, costs, claims, suits, demands, actions, causes of actions, proceedings, judgments, assessments, deficiencies and charges (collectively, "Damages") caused by, relating to, arising from a default in the performance by such party in accordance with this Agreement of its obligations hereunder, or a breach of its obligations hereunder, or a breach of its warranties or representations as made herein.

> In the event of a claim with respect to which a party may be the indemnified party hereunder, such party (the "Indemnified Party") shall notify the other party (the "Indemnifying Party") in writing as soon as practicable, but in no event later than thirty (30) days after receipt of such claims. The Indemnified Party's failure to provide such notice shall not preclude it from seeking indemnification hereunder unless such failure has materially prejudiced the Indemnifying Party's ability to defend such claim. The Indemnifying Party shall promptly defend such claim (with counsel of its own choosing) and the Indemnified Party shall cooperate with the Indemnifying Party in the defense of such claim, including the settlement of the matter on the basis stipulated by the Indemnifying Party (with the Indemnifying Party being responsible for all costs and expenses of such settlement). If the Indemnifying Party within a reasonable time after notice of a claim fails to defend the Indemnified Party, the Indemnified Party shall be entitled to undertake the defense, compromise or settlement of such claim at the expense of the Indemnifying Party. Upon the assumption of the defense of such claim, the Indemnifying Party may settle, compromise or defend as it sees fit.

12. At the time immediately after the 1999 Agreement was entered into, Remote Solution was supplying only dedicated remote control units (*i.e.,* remote control units that operated only one appliance) to Contec.

13. On March 16, 2000, Contec sent Remote Solution a sample of Contec's RT-U49C universal remote control unit and an instruction manual and asked Remote Solution for a price quote for manufacturing that unit. (Park Decl., Ex. C; *see also* Exhibit D, hereto, which is an early version of the RT-U49C instruction manual that would have been similar to the one sent to Remote Solution).

ATTORNEYS' EYES ONLY

14. On April 7, 2000, Contec placed an order with Remote Solution for the development of the mold and software for the RT-U49C. (Park Decl., Ex. E, first para.). Contec advised Remote Solution at that time that Remote Solution's development of the software and mold was intended to develop a secondary source for Contec's RT-U49C production. (*Id.*, third para). Contec also advised Remote Solution that its order was governed by the 1999 Agreement. (*Id.*, first para.).

15. <u>CONTEC</u>: In connection with its April 7, 2000 order, Contec provided Remote Solution with a sample remote control unit, containing a working sample of the software that Remote Solution was to duplicate exactly. Contec explained that "duplicate exactly" meant that all converter/TV/VCR codes were to be exactly the same as the sample along with its functionality. (Park Decl, Ex. E). (The converter/TV/VCR codes refer to the codes used to identify a given device from a given manufacturer during direct code entry programming.) Contec did not provide to Remote Solution any software source code — all software source code was developed independently by Remote Solution. Contec provided only specifications relating to how the remote control's features were to be operated by a user, including how to program the unit to recognize different appliances.

<u>REMOTE SOLUTION'S OBJECTIONS</u>: Remote Solution objects to paragraph 15 as inaccurate. While it is literally correct that Contec did not provide Remote Solution with written source code or object code, Contec sent Remote Solution sample remote control units containing microprocessors, and asked Remote Solution to copy them exactly so their "functionality" would be the same as the existing samples. Engineers in Korea analyzed the database contained in the samples and, per Contec's instructions, duplicated them exactly so that the remote control units provided to Contec would perform the same functions in the

ATTORNEYS' EYES ONLY

same manner as did the samples. As a result of Contec's instructions, Remote Solution

manufactured remote control units which have been held to infringe upon Philips' patent.

16. <u>CONTEC:</u> The "database" referenced in Remote Solution's objection to paragraph 15

contains the infrared codes that are transmitted from the remote control unit to a particular

device (such as a television) in order to operate that device. For a television, it contains the

codes for turning the television on, changing channels, changing the volume, etc. The

database does not contain the programming methods or other functionality that were the

subject of Philips' and UEI's infringement allegations.

<u>REMOTE SOLUTION'S OBJECTIONS:</u> Remote Solution objects to this as false. Remote

Solution copied all functions, including programming methods. To the extent that Contec is

basing any arguments on the theory that Remote Solution did not duplicate exactly what

Contec provided, or in the manner that Contec instructed or desired, then this is a material

dispute of fact which precludes a determination without an evidentiary hearing.

17. The April 7, 2000 letter, in which Contec placed its order, stated the following:

> As we discussed last week, Contec, LLC is placing the attached purchase order
> with you for the development of the mold and software for the RT-U49C remote
> control. This order is governed by the terms and conditions as defined in our
> Manufacturing and Purchase Agreement of February 16, 1999. All RCU software
> and samples provided to you under this purchase order are to remain confidential
> and proprietary as per the terms of that agreement.
>
> Under purchase order number P041441-00 attached, Contec request Hango to
> perform the following development tasks:
> 1) In approximately 2 weeks, Contec will supply you with a working sample of
> the software for you to duplicate. This software and codes must be duplicated
> exactly. If there are any questions or issues regarding "duplicate exactly",
> notify me immediately. This means that all converter/TV/VCR codes should
> be exactly the same along with the functionality of the remote. The software
> for this IC should be designed for use on Samsung IC's. Do not duplicate the
> software you presently have in your possession.
> 2) Contec will supply you with several samples of a case for the RT-U49C.
> Hango will duplicate these samples exactly. Upon receipt of these samples,

**ATTORNEYS' EYES ONLY**

Hango may begin the development process immediately.  Again, do not
duplicate the sample you may presently have in your posssesion.

... The development of the above software and mold is intended to develop a
potential secondary source for our RT-U49C production. ...



22. A Purchase Order from Contec to Remote Solution, dated April 10, 2000, specified that

Remote Solution was to deliver its software for the RT-U49C by May 1, 2000 and complete

its tooling for the mold by June 15, 2000.  (Ex. A, hereto).

23. Pursuant to purchase orders from Contec, Remote Solution would manufacture universal

remote controls according to specifications from Contec, which would sometimes include

**ATTORNEYS' EYES ONLY**

logos of customers of Contec to be placed on the remote control units, which Contec then re-sold to its customers.

24. The RT-U49C developed and manufactured by Remote Solution conformed with Contec's specifications relating to how the remote control's features were to be operated by a user, including the methods by which the remote control units were to be programmed to recognize different appliances by different manufacturers. Remote Solution did not change those specifications.



# Page 10 is completely redacted

**ATTORNEYS' EYES ONLY**



28. <u>CONTEC</u>:  Prior to the time Remote Solution began its development of the RT-U49C,

Remote Solution never undertook any investigation to determine whether the programming

methods actually or potentially violated any existing patents and never told Contec that it

would refuse to indemnify Contec under Section 3(c) of the 1999 Agreement if Contec did

not undertake such an investigation.

<u>REMOTE SOLUTION'S OBJECTIONS</u>: This statement is irrelevant.  As demonstrated in

the argument section, Contec, as purported indemnitee, had a legal duty to protect Remote

Solution, as indemnitor by protecting against acts which would give rise from a claim of

indemnity.  There is no comparable law requiring an indemnitor to protect an indemnitee

from its own negligence, gross negligence or recklessness.  This is particularly true where, as

here, Contec never informed Remote Solution of either (a) the prior assertion of infringement

by UEI, or (b) the fact that Contec did not take any steps to investigate whether there were

patents covering the specified methods.

Contec's statement that Remote Solution never said that it would not indemnify Contec

unless it undertook such an investigation is meaningless because (i) Contec stated that its

specifications were proprietary, the definition of which includes ownership rights, (ii) (ii)

Remote Solution never had the opportunity to make such an investigation because Contec

**ATTORNEYS' EYES ONLY**

never informed Remote Solution of the absence of any investigation, and (iii) Remote Solution understood the indemnity provision to apply only to infringement claims arising from elements originating from Remote Solution, and not from Contec.

29. At least as early as June 19, 2000, Remote Solution delivered to Contec samples of the RT-U49C that Remote Solution had developed.



32. On November 22, 2000, Contec's counsel, retained to investigate Philips' and UEI's infringement allegations, sent a letter, via facsimile, to Remote Solution's U.S. representative, notifying Remote Solution of those allegations and directing Remote Solution's attention to the indemnification provision of the 1999 Agreement. (Stein Decl., Ex. C, *see also* Stein Decl., Exs. D and E).



# Page 13 is completely redacted

**ATTORNEYS' EYES ONLY**

Arbitrator's Award Re Claimant's Standing, dated December 1, 2003, pp. 13-16, and the exhibits submitted by the parties in connection with that decision).

36. In an e-mail dated March 27, 2002, from Harry Mickey of Contec to Remote Solution, Mr. Mickey stated that "[i]t is Contec's opinion that we do not infringe [Philips' patents] and we attempted to convince Philips of this."

37. Philips had alleged that the RT-U49C, and models with similar features, infringed its U.S. Patent Nos. 4,703,359 and 5,877,562. With respect to the '359 patent, Philips alleged that the search method of programming the accused remote controls infringed its patent. In that method, the remote control cycles through all the codes stored in memory in the remote control unit until a code is found that operates the particular device (such as a particular make and model television) owned by the user. With respect to the '562 patent, Philips alleged that the direct code entry method of programming the accused remote controls infringed its patent. In that method, the user looks up, in a booklet provided with the remote control unit, a code that is uniquely associated with the user's particular device and enters that code using the remote control unit's keypad.



**ATTORNEYS' EYES ONLY**

39. <u>CONTEC</u>:  In response to Philips' interrogatories in the Philips' litigation, Remote Solution stated that its accused products, which include those it supplied to Contec, do not infringe the asserted <u>method</u> claims of the '359 patent on the following basis:

> RSC does not infringe those claims because those claims require that once the user sets up the remote control unit to identify the particular appliance that the user wishes to control, the remote control unit stores "signal structure identification data" corresponding to that appliance.  The term "signal structure identification data" means data that is used to index the product code look-up table to retrieve the address of a command table, but it does not encompass the address of the command table itself.  The remote control units "RCUs") [sic] assembled by RSC store the address of the command table itself, and therefore do not infringe.

(Suppl. Stein Decl., Ex. O, p. 10, last full para.).  That non-infringement argument is based on software design features that were not required by the specifications provided by Contec. Those features were solely Remote Solution's design.

<u>REMOTE SOLUTION'S OBJECTIONS</u>: Contec quotes from one of several responses to a "contention interrogatory" setting forth legal arguments as to why there should be no finding of infringement.  However, the District Court found that the programming method does infringe the '359 patent, and so the contention has been effectively determined to be legally incorrect, and so has no relevance here.

40. In the Philips' litigation, on April 5, 2004, the district court granted Compo Micro Tech, Inc. ("CMT"), one of Contec's former suppliers, summary judgment of non-infringement with respect to the '562 patent and granted Philips summary judgment of infringement with respect to the '359 patent.  (*See* Remote Solution's Compendium of Cases, Tab T, 312 F. Supp.2d 642, 648).  That ruling is on appeal by both parties.

41. <u>CONTEC</u>:  The non-infringement ruling was based on the court's construction of the term "an entry initiate key" in the claims of the '562 patent to mean "one entry initiate key." (*See*

Remote Solution's Compendium of Cases, Tab S, 312 F. Supp.2d 592, 604). The court held that because "[t]he parties do not dispute that, to begin programming one of CMT's accused URCs, a user must press a category key and a non-category key simultaneously," it "cannot be said that CMT's accused URC has one entry initiate key," and thus does not infringe the asserted claims of the '562 patent. (*See* Remote Solution's Compendium of Cases, Tab T, 312 F. Supp.2d 646, 648). The remote control units that Remote Solution manufactured and sold to Contec likewise require a user to press a category key and a non-category key simultaneously to begin programming, and thus the district court's conclusion applies equally to those remote control units. The court acknowledged in construing the term "an entry initiate key" that "[u]nless the claim is specific as to the number of elements, the article 'a' or 'an' receives a singular interpretation only in rare circumstances when the patentee evinces a clear intent to so limit the article." (Emphasis added). (*See* Remote Solution's Compendium of Cases, Tab S, 312 F. Supp.2d at 602). It found however that such rare circumstances were present in the '562 patent. That ruling is currently being appealed by Philips.

REMOTE SOLUTION'S OBJECTIONS: The District Court's claim construction ruling is available at Tab S of Remote Solution's Compendium of Decision dated March 17, 2005, and Remote Solution refers the Arbitrator to that decision for a complete and accurate report of the District Court's ruling. Contec's discussion of the '562 patent is merely an attempt to deflect attention from the fact that the District Court held that the universal remote control units infringed the '359 patent.

42. The user instructions provided to Remote Solution by Contec included two alternative methods for programming the remote controls to recognize different appliances of different manufacturers. The first method required the user to input a three-digit code associated with

ATTORNEYS' EYES ONLY

a given manufacturer (a list of manufacturers codes was included with the instructions), so that the remote control device recognized that manufacturer's device. The second method required the user to push and hold a key or series of keys, after which the remote control device would send out a series of signals, going through its stored library of codes, until the appliance recognized the signal and responded, at which time that code would be stored for future use. It is these two programming methods that gave rise to Philips' patent infringement claims.

43. CONTEC: At least as early as March 2000, Remote Solution advertised on its website its own remote control units, such as its model AB100, that could be programmed using both a direct code entry method and a search method. (*See* Suppl. Stein Decl., Ex. X, pp. 6-8). In the direct code entry method, Remote Solution's AB100 required the user to input a three-digit code associated with a given manufacturer (a list of manufacturers codes was included with the instructions), so that the remote control device recognized that manufacturer's device. In the search method, Remote Solution's AB100 required the user to push and hold a key or series of keys, after which the remote control device would send out a series of signals, going through its stored library of codes, until the appliance recognized the signal and responded, at which time that code would be stored for future use. Philips' patent infringement claims apply too to the programming methods of the AB100.

REMOTE SOLUTION'S OBJECTIONS: Remote Solution objects to the inclusion of this paragraph on the ground that it is incomplete and misleading as Contec has thus far refused to include in the paragraph the fact that Remote Solution has never sold the AB100 in the United States.

**ATTORNEYS' EYES ONLY**

44. <u>CONTEC</u>: Remote Solution manufactured and sold to at least ████████████████ ████████████████████████. remote control units that have a search method and direct code entry method of programming. (Suppl. Stein Decl., Ex. S, pp. 4, 5-6). Philips also accuses those remote control units of infringing its patents. (*Id.*). Remote Solution's sales of the accused remote control units to at least TIVO, Inc. started at least as early as March 31, 1999, prior to the time that Contec placed any orders for universal remote controls from Remote Solution. (*Id.*, p. 5).

<u>REMOTE SOLUTION'S OBJECTIONS</u>:  Remote Solution objects to this paragraph to the extent that it suggests that Remote Solution continues to sell infringing universal remote controls into the U.S.  Remote Solution has ceased selling such units.

As to past sales involving ██████████████████████, they are irrelevant to this action.  Contec's claim for indemnity, and Remote Solution's defense to liability, is based on (i) a legal determination as to whether the terms of the Agreement permit indemnification for claims arising from Contec's own misconduct, including Contec's own negligence, and (ii) a determination as to whether Contec acted negligently, grossly negligently or recklessly toward Remote Solution.  Remote Solution's dealings with customers other than Contec has nothing to do with those issues, and their inclusion herein is simply to deflect attention from Contec's own failures.

45. <u>CONTEC</u>:  By early 2000, numerous companies were offering universal remote control units that could be programmed using both a direct code entry method and a search method (the features Philips accused of infringement), including Remote Solution, Ohsung/Universal Remote Control, Inc., RCA, RadioShack, Sharp Electronics, JVC, and Jasco Products. (*See*

ATTORNEYS' EYES ONLY

Ex. E, hereto, pp. 6, 11-12; Ex F, hereto, pp. 3-4; Ex. G, hereto, p. 37; Ex. H, hereto, pp. 14-15; Ex. I, hereto, last three pages).

REMOTE SOLUTION'S OBJECTIONS: Remote Solution objects to paragraph 45 on the grounds that it is inaccurate and misleading as not supported by competent proof. The problem arises with Contec's use of the phrase 'search method,' and the inference that those methods were the same as that patented by Philips. Such is not the case. Based on documents from 5 manufacturers (RCA, Jasco, JVC, Sharp and Radio Shack) provided by Contec to Remote Solution, only the Radio Shack model appeared to perform in a manner similar to that of Philips' auto-scan method. The others required the user to keep pushing a button over and over (as many as 100 times) until an appliance recognizes the signal. This method differs from Philips' patented method.

Further, Contec did not provide any evidence regarding Ohsung/Universal Remote Control, Inc., identified in the paragraph.

Finally, the reference to Remote Solution is misleading. Remote Solution does not offer universal remote controls with the auto-scan method. Remote Solution merely manufactures remote controls according to specifications provided by its customers. Remote Solution does not decided what programming method or methods are to be included in any remote control units.

46. REMOTE SOLUTION: According to an earlier version of Contec's website, "Since 1978, Contec has been a leader in providing quality products and services to the broadband communications industry...As a major distributor of OEM products, Contec is a prime source for new set-tops, cable modems and parts. Contec provides innovative designs and program

ATTORNEYS' EYES ONLY

simplicity as the leader in remote controls...." Contec has approximately 500 employees and annual operating revenue of $65,000,000.

CONTEC'S OBJECTIONS:  The information provided in this paragraph is inaccurate and misleading.  For example, the revenue figure, which according to information provided by Remote Solution is an estimate for 2001 from a market research firm called Goliath, is grossly overstated.  In addition, remote control sales are a relatively small part (about 25% in 2001) of Contec's overall business.  Contec's primary business is the repair and sale of set-top converter boxes to cable television companies.  In addition, Contec's remote control business is small in comparison to, for example, UEI, the market leader in remote control sales (UEI reported revenue of $124.7M in its 10-K for fiscal year 2000).

In any event, the information provided about Contec is irrelevant.  Contec provided information about Remote Solution only because Remote Solution has attempted to paint itself as an inexperienced remote control manufacturer led astray by Contec.  The facts below demonstrate that that is false — Remote Solution was an experienced remote control manufacturer and was already making and selling units like those Philips accused of infringement before it had made any such units for Contec.

47. CONTEC:  Remote Solution has been in the business of designing and manufacturing remote control units since 1994. (Suppl. Stein Decl., Ex. P, p. 1).  As reported by Dunn & Bradstreet in 1998, 100% of Remote Solution's business was directed to the manufacturing of remote controls and Remote Solution had, at that time, 110 employees and approximately $8.7M in sales.  (*Id.*, pp. 1, 5).  In addition, its president, Hong Bum Shin, was reported by Dunn & Bradstreet to have "managerial competence and extensive knowledge in this business [the

ATTORNEYS' EYES ONLY

manufacturing of remote controls] based on his 8 year experience at Hae Pyung Electronic Co., Ltd., which was involved in similar business line." (*Id.*, p. 5).

REMOTE SOLUTION'S OBJECTIONS: Remote Solution's financial condition seven years ago is irrelevant to these proceedings.

48. Prior to receiving Contec's initial order for an RT-U49C, both Remote Solution and Hango Electronics, Inc. — its local U.S. corporation (*see* Park Decl., Ex. A, last page) — advertised Remote Solution's numerous remote control units, including universal remote control units, and their ability to develop "custom" and "semi-custom" models. (See Suppl. Stein Decl. Exs. Q and R; Park Decl., Ex. A, last page).

49. In 1997, Remote Solution actively sought to "expand its RCU [remote control unit] sales by entering the United States consumer market," and its "business plan was to sell as many RCUs as possible." (Suppl. Stein Decl., Ex. S, pp. 3-4).

50. Remote Solution has refused to indemnify Contec against Philips' and UEI's infringement allegations.

51. In a letter dated July 1, 2003 from Contec's counsel to Judge Jordan in the Philips litigation, Contec explained that it would be prejudiced if the Consent Judgment and Order was not filed under seal because it "contain[s] admissions regarding infringement and validity that Philips demanded as a condition of settlement." (Emphasis added).

52. On August 28, 2003, the Hon. Kent A. Jordan entered a publicly-filed Consent Judgment and Order that states, in part, that "Contec and Seoby have infringed United States Letters Patent Nos. 4,703,359 and 5,872,562 by their manufacture and sale of universal remote control units using (i) the programming system Contec referred to in connection with the remote control units accused in this Action as "Point and Press Programming" and (ii) a programming