ATTORNEYS' EYES ONLY

system that Contec used in connection with the remote control units accused in the Action

that required the user to input "setup" codes for different appliances, both of which (i) and (ii)

refer to the specific methodology employed in remote control units sold prior to this time and

that were at issue in this litigation."

## II.    Summary of Arguments Relating to Contec's Entitlement to Indemnification from Remote Solution

### A.    Contec's Statement

#### Contec is Entitled to Indemnification Based on the Crystal Clear Indemnification Provision in the Parties' 1999 Agreement.

The parties' 1999 Agreement indisputably requires Remote Solution to indemnify Contec

against any patent infringement claims directed to the products Remote Solution manufactured

under the Agreement, including those brought by Philips and UEI.[2]  Specifically, Section 3(c)

requires Remote Solution to defend Contec against "any suit or proceeding" based on a claim

that "the Products" manufactured by Remote Solution and sold to Contec under the Agreement

"constitute an infringement" of a patent.  (Fact No. 10[3]).  Section 1(a) defines "Products" as the

"RCU's [remote control units] designed and/or manufactured and sold by Seller [Remote

Solution] to Purchaser [Contec] pursuant to this Agreement."  (Fact No. 8).  Section 1(a)

additionally specifies that Remote Solution was to design those products "in accordance with

such specifications" provided by Contec.  (Id.) (emphasis added).  Remote Solution

manufactured and sold to Contec, pursuant to the 1999 Agreement, remote control units that

---

[2]  See Statement of Contec Corporation Regarding Its Bases for Relief ("Contec's Statement"), pp. 2-4; Contec's Reply Brief in Support of its Statement Regarding its Bases for Relief ("Contec's Reply"), pp. 2-7.

[3]  References to Fact No. ___ refer to the enumerated paragraphs in the "Undisputed and Disputed Facts" section above.

**ATTORNEYS' EYES ONLY**

Philips and UEI claimed infringed their respective patents. Contec was accordingly entitled, under Section 3(c), to indemnification from Remote Solution against those claims.

In its Objection to Fact No. 28, Remote Solution asserts that "Remote Solution understood the indemnity provision to apply only to infringement claims arising from elements originating from Remote Solution, and not Contec." It is however black letter law that a party's subjective intent, such as Remote's Solution's here, is irrelevant where, as here, the terms of a contract are clear.[4] The plain terms of the 1999 Agreement should be enforced as written. Contec is entitled to indemnification.

### Remote Solution's Arguments that the Indemnification Provision is Unenforceable Are Completely Without Merit.[5]

Remote Solution argues that Contec cannot enforce the provisions of Section 3(c) because Contec was negligent in providing specifications that gave rise to infringement allegations. Specifically, it argues that an indemnity agreement "will not be deemed to

---

[4] *See, e.g., Cusano v. Horipro Entm't Group*, 301 F. Supp. 2d 272, 277 (S.D.N.Y. 2004) ("When the terms of a contract are clear, the secret or subjective intent of the parties is irrelevant.") (citing *Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997)); *Sparaco v. Lawler, Matusky, Skelly Eng'rs, LLP*, 60 F. Supp. 2d 247, 256 (S.D.N.Y. 1999) ("as the parties' subjective intent is irrelevant and the words of the contract are unambiguous, I can resolve this dispute by construing the contract."); *N.Y. State Teamsters Council Health and Hosp. Fund v. Perfection Oil Co.*, No. 95-CV-125, 1998 WL 315096, at *4 (N.D.N.Y. Jun. 11, 1998) ("Because the Court finds the contract to be unambiguous, extrinsic evidence of the parties' subjective intent is irrelevant and unnecessary for the Court to consider.") (citing *Kinek v. Paramount Communications, Inc.*, 22 F.3d 503 (2d Cir. 1994)); *First Montauk Sec. Corp. v. Menter*, 26 F. Supp. 2d 688, 689 (S.D.N.Y. 1998) ("it is hornbook law that the uncommunicated subjective intent of a party is irrelevant in interpreting a contract."); *Padovano v. Vivian*, 629 N.Y.S.2d 844, 846 (App. Div. 1995) ("Extrinsic evidence of plaintiffs' uncommunicated subjective intent is irrelevant."); *Hudson-Port Ewen Assocs., L.P. v. Kuo.*, 566 N.Y.S.2d 774, 777 (App. Div. 1991) ("Since the only extrinsic evidence asserted as the basis for creating a factual issue consists of defendants' uncommunicated subjective intent, summary judgment is appropriate.").

[5] The parties did not exchange their respective argument summaries before submitting this Joint Statement. Contec may accordingly seek the opportunity to respond to any new arguments raised by Remote Solution.

ATTORNEYS' EYES ONLY

indemnify a party for its own negligent acts unless the contract demonstrates an 'unmistakable intent' to indemnify the negligent party."[6] The only supposedly negligent act that Remote Solution identifies is Contec's failure to do an investigation into possible patent infringement claims before providing specifications to Remote Solution. (*See* Fact No. 27). Remote Solution argues, alternatively, that Contec's entitlement to indemnification may be barred as a result of Contec's "own intentional, reckless or grossly negligent conduct." (Opp., p 13). Remote Solution does not however identify any specific acts by Contec that would constitute such conduct. Its arguments fail for the following reasons:

1.    Remote Solution's arguments are nothing more than a bald attempt to rewrite an agreement that it no longer wishes to abide by. Remote Solution knew when it entered into the 1999 Agreement that Contec would be providing specifications for the products it would be manufacturing. Section 1(a) expressly stated that Contec would be providing such specifications. (*See* Contec's Statement, pp. 2-3; Contec's Reply, pp. 2-3; Fact No. 8). It had nevertheless plainly and indisputably agreed, in Section 3(c), to indemnify Contec against "any" patent infringement claims directed at those products. (Fact No. 10). Thus, as between Contec and Remote Solution, the parties had agreed to allocate the risk of patent infringement claims to Remote Solution. Yet now Remote Solution seeks to add a contingency to the 1999 Agreement — namely, that Remote Solution is only required to live up to its indemnification obligations under Section 3(c) if Contec performed an investigation into possible infringement claims before providing its specifications to Remote Solution. This makes no sense. No such requirement is found in the 1999 Agreement and Remote Solution never asked for such an investigation before

---

[6] *See* Brief of Remote Solution Co., Ltd. in Opposition to Contec Corporation's Claim for Relief ("Opp."), p. 9.

undertaking any work under the Agreement. (Fact No. 28). Remote Solution cannot add that requirement now.

Moreover, it was Remote Solution's responsibility, not Contec's, to conduct such an investigation if it deemed one necessary to live up to its indemnification obligations under the Agreement. Contec's initial order for the RT-U49C, one of the devices later accused of infringement, was quite clear — Contec was to provide a sample of its existing RT-U49C and Remote Solution was to develop the software and mold for a duplicate of that model. (*See* Fact Nos. 14-17). In the letter conveying that order, Contec expressly told Remote Solution that "[t]he development of the above software and mold is intended to develop a potential secondary source for [Contec's] RT-U49C production." (*See* Fact No. 17). The letter also stated that the order is "governed by" the 1999 Agreement, which includes its indemnification provisions. (*Id.*). Remote Solution thus knew precisely what the task before it was and what its obligations were. If it had an issue with carrying out any of its obligations under the Agreement in view of that task, the time for Remote Solution to raise it was then. It is simply preposterous for Remote Solution to claim now that the indemnification clause is unenforceable due to Contec's failure to conduct an investigation when it was the party responsible for defending against infringement claims under the Agreement and it had itself failed to conduct any such investigation after receiving specifications from Contec. (*See* Fact No. 28).

2.    Courts and the U.C.C. have recognized the power of parties to enter into precisely the type of indemnification agreements at issue here — *i.e.*, one requiring a manufacturer to indemnify a buyer against all patent infringement claims, including claims directed at features required by a buyer's specifications. (*See* Contec's Reply, p. 3). This is exactly what the parites did here — they expressly agreed that Remote Solution would indemnify Contec against any

**ATTORNEYS' EYES ONLY**

patent claims directed at the Products.  Neither the case law nor the U.C.C. requires the buyer to

do an investigation into potential infringement claims, as Remote Solution asserts, in order to

enforce such an agreement

3.



ATTORNEYS' EYES ONLY



---

[7] *See* Fact Nos. 44 and 45.  Remote Solution argues in its objection to Fact No. 45 that the search method offered by some of the other manufacturers was different than Contec's — namely, in that they required the user to repeatedly press a key in order to sequence through the codes whereas in the method offered by Contec the user held a key down continuously and the sequence of codes was automatically transmitted.  However, as the District of Delaware held in an earlier litigation involving Philips' '359 patent, the '359 claims also cover repeatedly pressing a key to sequence through the codes.  *Philips Elecs. N. Am. Corp. v. Universal Elecs., Inc.*, 930 F. Supp 986, 999 (D. Del. 1996) (holding that "the words 'transmitting in sequence a plurality of response command signals' in claims 1 and 6 [of the '359 patent] should not be construed to provide for an automatic transmitting of a plurality of response command signal.  Rather, these words are broad enough to include a user transmitting in sequence one at a time a plurality of response command signals ...."). Thus, the distinction Remote Solution seeks to draw between the search method offered by Contec and the methods offered by other companies is meaningless.

**ATTORNEYS' EYES ONLY**



4.    <u>Contec's indemnification claims do not stand or fall together.</u>  Even if the

Arbitrator concludes that Contec's conduct, whether by reason of negligence or some higher

level of conduct, bars some of Contec's indemnification claims, the Arbitrator must then decide

which claims are so barred.  Patent infringement is a continuing tort and each act of infringement



ATTORNEYS' EYES ONLY



For example, Remote Solution's argument that Contec's indemnification claim is barred due to its failure to investigate potential patent claims before providing specifications to Remote Solution applies only to the approximately 34,000 units shipped before it was notified of Philips' and UEI's infringement claims. (*See* Fact Nos. 30-32 and 34). That argument does not apply to the over 1.4 million units it shipped after being fully apprised of those claims. (*See* Fact Nos. 33 and 34).

Similarly, Remote Solution's argument that Contec's indemnification claim should be barred because Contec was responsible for providing infringing specifications to Remote Solution does not apply at all to Philips' '562 patent. That patent was held, in proceedings that continued against Contec's suppliers after Contec settled, to be not infringed by Contec's products. (Fact No. 40). Remote Solution has never offered any explanation whatsoever regarding how Contec could possibly be negligent in providing specifications that <u>do not</u> infringe a patent.[10]

---

[9] *See Augustine Med., Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367, 1371 (Fed. Cir. 1999) (citing *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1221-22 (Fed. Cir. 1995) and *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1031 (Fed. Cir. 1992)).

[10] Even though the '562 patent was ultimately held to be not infringed, it was nonetheless Remote Solution's duty under the agreement to defend Contec against those infringement

ATTORNEYS' EYES ONLY

Still further, Remote Solution's argument that it was Contec's specifications alone that have any bearing on Philips' infringement claims and that Remote Solution's software is irrelevant to those claims does not apply to Philips' '359 patent. Remote Solution had itself argued in the Philips' litigation that the products it manufactured for Contec, and its other accused products, do not infringe the '359 patent based on a software design feature that was solely Remote Solution's design choice, and not required by the specifications provided by Contec. (*See* Fact No. 39; Contec's Reply, p. 5). While the district court ultimately rejected that argument, Remote Solution cannot reasonably claim that its software has no bearing on the issue of infringement after asserting in court that it does. Moreover, the district court's ruling is currently being appealed and may yet be reversed. Significantly, there is no basis whatsoever in the 1999 Agreement for releasing Remote Solution from its indemnification obligations based on the success *vel non* of a non-infringement argument.



allegations. (Fact No. 10). Having failed to do so, Contec was entitled to undertake the defense and settlement of those claims. (Fact No. 11; Contec's Reply, p. 7, n. 12).

ATTORNEYS' EYES ONLY

Contec simply had no reason to suspect that those common features would become the subject of Philips' infringement allegations at the time it placed its initial order with Remote Solution.

5.    Remote Solution's negligence theory simply has no application to a patent infringement claim — no court has ever applied it to such a claim or held a provision for indemnification against patent infringement unenforceable due to an indemnitee's alleged negligence. (*See* Reply, pp. 3-4). Simply, the theory, as stated by Remote Solution, essentially applies only to negligence-based claims between a third-party and an indemnitee — *i.e.*, the issue under that theory is whether the indemnitee acted negligently toward a third-party, giving rise to a cause of action by that third party. If so, the theory holds, the indemnitor will not be required to indemnify the indemnitee unless the agreement demonstrates an unmistakable intent to indemnify the negligent party against such negligent acts (*i.e.*, the acts giving rise to the cause of action). That theory has nothing to do with whether or not the indemnitee acted negligently, in some sense or other, toward its indemnitor.[11] All but one of the cases cited by Remote Solution addressed such negligence-based claims.

In the one exception, *Fendley v. Power Battery Co.*, 561 N.Y.S.2d 760, 762 (App. Div. 1969), the Court extended the theory to a strict products liability claim, again brought by a third party. (*See* Letter from Mr. Stein to Mr. Plant dated April 1, 2005, p. 2). But as extended, the theory holds only that a contract for indemnity will not be deemed to indemnify a party for its own strict products liability unless the contract demonstrates an unmistakable intent to indemnify

---

[11] In one case cited by Remote Solution, *Sweeney v. Hertz Corp.*, 740 N.Y.S.2d 19 (App. Div. 2002), a customer of Hertz rental car company was injured in an automobile accident, along with other passengers in the automobile, and the injured parties sued Hertz for negligent maintenance of the vehicle. Hertz then filed a third-party action against the customer for indemnification under the rental agreement. In that case however, the customer essentially stood in the role of a third-party having a negligence cause of action against the indemnitee (Hertz). The case did not address any alleged negligence between the parties in their roles as indemnitee and indemnitor.

ATTORNEYS' EYES ONLY

the liable party.  If the theory were extended to a patent infringement claim, <u>which no court has ever done</u>, it would hold that a contract for indemnity will not be deemed to indemnify a party for its own acts of patent infringement unless the contract demonstrates an unmistakable intent to indemnify the infringing party.  That is a higher standard than required for interpreting the indemnification provision at issue here,[12] but it is nonetheless met — the 1999 Agreement plainly demonstrates such an unmistakable intent.  Remote Solution is simply seeking to inject the issue of negligence, in a loose colloquial sense, into these proceedings by misinterpreting a rule of law directed to negligence-based causes of action.  (*See* Contec's Reply, p. 4).

6.



---

[12] *See Park-Ohio Indus., Inc. v. Tucker Induction Sys., Ltd.*, 1988 WL 1045372, at *1-2 (E.D. Mich. 1987)(holding that the U.C.C. warranty against patent infringement "does not require the recitation of any particular disclaimer").

### No Evidentiary Hearing is Required.

Contec does not believe there is any need for an evidentiary hearing. Contec is entitled to indemnification based on the undisputed facts set forth herein.

If however the Arbitrator decides there are material facts still in dispute, Contec respectfully requests that the Arbitrator identify the specific portions of Contec's indemnification claim to which those facts apply, so that Contec can assess whether it makes sense pursuing those portions in view of the expense of a hearing. For example, Remote Solution shipped 97.6% of the remote control units subject to Philips' and UEI's infringement allegations after Contec had notified Remote Solution of those allegations. (*See* Fact No. 34). If the Arbitrator believes there are issues of fact relating to Contec's entitlement to indemnification for the 2.4% of the units shipped before Remote Solution was notified, it may make sense to forego those claims — if, e.g., the cost of the hearing will exceed the claims. Similar considerations may be involved, for example, for Contec's indemnification claims relating to UEI's infringement allegations, which are only 13% of Contec's total claim. (*See* Contec's Statement, p. 8).

### B.    **Remote Solution's Statement**

As set forth in Remote Solution's Brief in Opposition to Contec Corporation's Claim for Relief dated March 17, 2005, and Remote Solution's supplemental letter dated March 29, 2005[13], it is Remote Solution's position on the limited issue of liability for indemnification that (i) in accordance with the line of precedent under applicable New York law cited by Remote Solution, the language of the indemnity provisions of the Agreement are not sufficiently broadly worded

---

[13] Remote Solution incorporates herein by reference the arguments and authorities contained in its Brief in Opposition to Contec Corporation's Claim for Relief dated March 17, 2005, its supplemental letter dated March 29, 2005, and all declarations and exhibits submitted in support thereof. Remote Solution does not repeat those arguments herein, and focuses instead on whether Contec's conduct was negligent or grossly negligent or reckless such that it is precluded from claiming indemnification.

so as to encompass liability for patent infringement that is the result of Contec's own infringing

design (as opposed to any design by Remote Solution), and (ii) New York law prohibits

indemnification arising from the gross negligence or recklessness of the indemnitee.



An "indemnitee has a duty to act reasonably under all the circumstances so as to protect

the indemnitor against liability." **American Export Isbrandtsen Lines, Inc. v. U.S.**, 390

F.Supp. 63, 68 (S.D.N.Y. 1975).[15]  Under this rule of law, "[i]t is well established that any act on

---

[14]    There are any number of companies who do "infringement searches" to investigate
whether    a    proposed    product    may    infringe    an    unexpired    patent.    *See, e.g.,*
www.jsinventions.com/search,                    www.expresssearch.com/attorney/services.html,
www.thomsonderwent.com/products/cpi/searcghservices/services/enhanced,                    and
www.specializedpatent/com/pat_infringe.html.  While Internet web sites may not have been as
prominent in 1999, these types of business existed.

[15]    This rule is simply a variation of the traditional rule of negligence law that "[a] party
who engages in affirmative acts which create a danger owes a duty to exercise reasonable care in

ATTORNEYS' EYES ONLY

the part of an indemnitee which materially increases the risk, or prejudices the rights of the indemnitor, will discharge the indemnitor under a contract of indemnification." **Unisys Corp. v. Legal Counsel, Inc.,** 769 F.Supp. 6, 8 (D.D.C. 1991). *Accord* **American Export Isbrandtsen Lines, Inc.,** 390 F.Supp. at 69 (indemnitee has a duty to take "reasonable measures...to protect the interests of the party from whom it seeks indemnification"). Thus, Remote Solution maintains that Contec, as purported indemnitee, had a duty to use reasonable efforts to avoid the risk of a lawsuit over patent infringement arising from the specifications for the operation of universal remote control units that Contec provided to Remote Solution.

In so stating, Remote Solution does not suggest that Contec had to be an insurer against any possibility of an infringement lawsuit, as this would be an impossibility. Remote Solution maintains, however, that Contec had an obligation to undertake some reasonable level of investigation before requiring Remote Solution to assume the risk of infringement from the sale of the universal remote control units. Remote Solution further maintains that Contec had a duty to inform Remote Solution of known potential risks when contracting for Remote Solution to manufacture URCs according to Contec's specifications.

Contec sent Remote Solution a sample URC, along with an instruction manual which described the functions the URC was to perform. (Stipulated Fact ¶13). Amongst those functions was permitting an end-user to program the URC to recognize and control different appliances from different manufacturers merely by holding down one button until the URC and the appliance recognized each other (called the "autoscan" or "point and press" method of programming). On April 7, 2000, Contec sent a letter to Remote Solution, advising that it would

---

protecting those exposed to the danger." **Varga v. Parker,** 524 N.Y.S.2d 905 (N.Y.A.D. 4[th] Dept. 1988).

ATTORNEYS' EYES ONLY

send a "working sample of the software," which Contec instructed had to be "duplication exactly," including the "functionality of the remote." (Park Decl. Ex. E).

Contec sent Remote Solution a sample URC with a working microprocessor. Engineers in Korea analyzed the database and, as a result, were able to duplicate it per Contec's instructions, including the codes which instruct the URC, upon a user pushing the appropriate buttons, to scroll through a stored library of signal codes, one of which is assigned to each remotely controllable appliance of each manufacturer.

As a result, Remote Solution was able to manufacture for Contec URCs which operated exactly like the ones Contec asked Remote Solution to duplicate. This is what the parties intended, and this is what was achieved.[16]



---

[16]    Contec was unwilling to stipulate to these facts. It is Remote Solution's position that it is obvious that the "auto-scan" or "point-and-press" programming method which has been held to violate Phillips' patent was what Contec requested and what Contec received. To the extent, however, that the Arbitrator is unable to so conclude from the evidence presented, this creates a material factual issue which precludes summary judgment.

Page 37 is
completely redacted

**ATTORNEYS' EYES ONLY**



Although Remote Solution has not seen Contec's argument, it will now address some of the defenses hinted at by Contec in its objections to certain factual statements.[18]   First,   Contec attempts to argue that the infringement actions did not arise from its specifications, but from Remote Solution's allegedly independent action in designing the software which implemented the programming methods.   Any such argument is specious.   First, Philips did not assert any software claims.   Indeed, there are none identified in the patents.   (Finger Decl. Ex. A). Moreover, the U.S. District Court entered a consent judgment against Contec for infringement of the method claims, not any software claims.   (**Id.** Ex. H).[19]   Contec has stipulated that it supplied

---

[18]      Any failure of Remote Solution to respond to any arguments set forth by Contec are not to be deemed a concession of the correctness of those arguments, but only a failure to anticipate such arguments.

[19]

ATTORNEYS' EYES ONLY

the specifications for the methods that users could use to program the universal remote controls to recognize and operate various appliances, and that Remote Solution followed those specifications without modification. Philips did not make any claims against either Contec or Remote Solution for anything other than what Contec instructed Remote Solution to do, plain and simple, and Contec's efforts now to deny that fact are shameless and desperate.[20]

Remote Solution set forth earlier in this argument how Remote Solution copied the device, including the microprocessor and database provided by Contec, as Contec had requested. Contec cannot now attempt to get around its own wrongdoing by finessing the infringement claim, and denying that it was the source of the infringing "functionality."

---

[20] Put another way, the autoscan method involves searching through a stored library of codes to find a code which operates a specific appliance, When a specific appliance responds to a specific code, that code is then stored in memory for later commands to insure that the appliance responds to the remote control. (*See* Finger Decl. Ex. A). It does not matter how the microprocessor achieves that result. If source code for various universal remote controls was all written differently, but effectuated the units' searching for, finding and storing a code applicable to a particular appliance, then they would all infringe the method patent, irrespective of the process used to perform the method.

A universal remote control could not operate according to the specifications provided by Contec through its sample instruction manual (*i.e.,* by holding down a button until the appliance is recognized), unless the remote control device searched for a stored codes in the manner described above. Thus, for Remote Solution to copy the "functionality" exactly, it had to copy the method. Contec has not identified to Remote Solution any other way the "functionality" could be copied exactly.

Contec also refers to Remote Solution's answers to contention interrogatories referring to software codes. However, the legal positions set forth in that contention was rejected by the District Court, which found that the universal remote control units infringe the '359 patent, and so the contention interrogatory responses have been deemed incorrect as a matter of law, and are not binding on Remote Solution.

Contec has included in the stipulation of facts that the issue of claim construction is currently on appeal. If Contec believes that the appeal is material to its argument, then the arbitration should be stayed pending a decision in that appeal.

**ATTORNEYS' EYES ONLY**

In any event, Contec's argument that Remote Solution independently designed the infringing method is a red herring. The point is that Contec asked Remote Solution to provide copies of existing URCs per Contec's direction, without informing Contec that there were known, existing issues of potential patent infringement, and after having misleadingly stated that Contec had proprietary rights in the software. As noted above, this denied Remote Solution the opportunity to refuse the offer until such time as the infringement issues were investigated and resolved.

Contec next suggests that it was Remote Solution's obligation to undertake an investigation, not Contec's. This is incorrect for several reasons. First, the case law cited earlier holds that it is the *indemnitee* that has the legal duty to take reasonable steps to protect the indemnitor from loss under the indemnity agreement. Remote Solution is not aware of any case law holding the indemnitor to a similar duty to protect the indemnitee.

Second, Contect stated in both the Agreement (Park Decl. Ex. A) and in a letter to Remote Solution (**id.** Ex. E) that the specifications were Contec's "proprietary" information. The word "proprietary" includes in its definition "held under a patent, trade-mark or copyright by a private person or company...." **Webster's New Twentieth Century Dictionary Unabridged** 1444 (2nd ed. 1974). *Accord* **Black's Law Dictionary** 1097 (5th ed. 1979) ("made and marketed by a person or persons having the exclusive right to manufacture and sell such"); **The American Heritage Dictionary of the English Language** 1050 (1970) ("[o]wned by a private individual or corporation under a trademark or patent"). Remote Solution had the right to take Contec at its word, *i.e.,* that it was providing specifications to which it had exclusive ownership rights, and was not obligated to undertake any investigation, particularly since that

**ATTORNEYS' EYES ONLY**

obligation belonged to Contec in the first instance, and since it was Contec, and not Remote Solution, that was on notice of possible infringement.

Third, to the extent that Contec is suggesting that Remote Solution, by executing the Agreement (or fulfilling the purchase order), assumed the risk of infringement, Contec is incorrect as a matter of law. Under applicable New York law, the element of risk assumed by one party does not relieve the other party of the obligation to use reasonable care to protect against a risk which might reasonably be anticipated. **Hochreiter v. Diocese of Buffalo**, 764 N.Y.S.2d 753, 754 (N.Y.A.D. 4th Dept. 2003). Thus, Contec was not relieved of its duty to exercise reasonable care, particular as it was on notice of the risk of infringement.



**ATTORNEYS' EYES ONLY**



Contec next attempts to deflect from the real issue by pointing to the fact that Remote Solution sold universal remote control units with similar programming methods to other customers, pursuant to their specifications. However, Contec was not sued by Philips over those sales, only its own pursuant to its own specifications, and cannot seek indemnification for the claim against it based on Remote Solution's unrelated conduct with other customers.

In this regard, it is important to note that Remote Solution does not design remote control units (except for the shell or casing). It does not design microprocessors or programming methods. It is a manufacturing company that merely builds remote control units in accordance with the instruction of its customers.

**ATTORNEYS' EYES ONLY**

The language of the indemnification provisions of the Agreement is not sufficiently broad to encompass claims arising from Contec's own negligence. In this case, Contect's conduct was not simply negligent, it was grossly negligent if not reckless, and such culpability should not be rewarded.